**EDWARD PETERSON CO. v. O'MALLEY,**
Collector of Internal Revenue.
Civ. No. 44–51.

United States District Court
D. Nebraska, Omaha Division.
July 3, 1953.

William F. Dalton, Omaha, Neb. (William F. Dalton, William J. Hotz and William J. Hotz, Jr., Omaha, Neb., on brief), for plaintiff.

Harvey M. Spear, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Harvey M. Spear, Sp. Assts. to Atty. Gen., Washington, D. C., and Joseph T. Votava, U. S. Atty., District of Nebraska, Omaha, Neb., on brief), for defendant.

DONOHOE, Chief Judge.

The plaintiff, Edward Peterson Company, a Nebraska corporation, instituted this action to recover the sum of $62,702.27, with interest, the total amount of excess profits taxes which plaintiff asserts were wrongfully assessed and collected by the Director (formerly Collector) of Internal Revenue for the taxpayer's fiscal year ending March 31, 1942. Jurisdiction of the action is vested in this court by virtue of Section 1340, Title 28 U.S.C.A. Venue is properly laid in the Omaha Division of the District of Nebraska, 28 U.S.C.A. § 1391 (b), and the conditions precedent to filing a suit for refund as specified in Section 3772 of Title 26 U.S.C.A. admittedly have been complied with. Since neither party made a demand for a jury trial, all issues were tried by the court, Rules 38(b, d), and 39(b), Federal Rules of Civil Procedure, 28 U.S.C.A.; and after careful considera-

362

tion of the properly admissible evidence adduced during the proceedings the Court makes the following special Findings of Fact:

The Edward Peterson Company, the taxpayer and plaintiff herein, was incorporated on April 20, 1931, in the state of Nebraska and maintains its principal place of business at Omaha, Nebraska. The taxpayer carries on the business of a general contractor, which includes the construction of highways, railroads, dams, levees, factory sites and the like. These construction projects are performed by the taxpayer pursuant to contracts entered into by the taxpayer as prime contractor, sometimes on its own account and sometimes in conjunction with other firms.

In April of 1937, plaintiff, A. Guthrie & Co., and John Marsch, Inc., executed a joint venture agreement providing that the joint venturers were to submit a bid to the Carnegie-Illinois Steel Corporation about April 23, 1937, for excavation and foundation work on the Irvin Mill Project in Camden, Pennsylvania. The agreement provided that if the joint venturers were successful in obtaining a contract for this work that a corporation, named Guthrie-Marsch-Peterson Company, would be formed for the execution of the contract. The capital stock of the proposed corporation was to be $300,000, of which each of the joint venturers was to subscribe $100,000, paying $50,000 cash, and the balance upon call of the corporate treasurer. The proposed corporation was to be managed, according to the joint venture agreement, by a board of directors under whose control there was to be a committee of three persons, one person representing each of the joint venturers. This committee of three was to be superior in authority to the general superintendent who in turn was to be in direct charge of operations. The joint venture agreement contains the following diagram of the proposed job organization under the committee:

The joint venture agreement provided that none of the officers, directors or members of the three-party committee of the proposed corporation were to receive salaries or expenses; however, the joint venturers were to receive payment for use of their grading equipment by the corporation. The joint venture agreement further provided that the funds of the proposed corporation were to be appropriated in the following order:

1. Payment of all costs of the work and claims against the corporation not including payments for use of the participants' grading equipment.

2. Payment for use of participants' grading equipment.

3. Return of capital investment.

4. Dividends.

Pursuant to the joint venture agreement just mentioned, plaintiff had Edward Peter-

son, John Hershey and Robert Peterson go to the project location, gather information as to the labor and material costs of the required work and prepare individual estimates on the cost of the seventy or eighty items which the bid was to cover. Each of the other joint venturers made a similar determination of the costs of each bid item and representatives of the three joint venturers met in Pittsburgh, Pennsylvania, to discuss these individual estimates. Upon conclusion of their discussion they agreed upon the overall bid to be submitted to the Carnegie-Illinois Steel Corporation. The bid agreed upon was so submitted on April 26, 1937, in keeping with the original joint venture agreement.

The bid submitted was accepted by the Carnegie-Illinois Steel Corporation. Formal confirmation of the acceptance appears in a letter addressed to plaintiff, A. Guthrie & Co., and John Marsch, Inc., at their respective business residences, dated May 15, 1937, and signed by Charles R. Miller, Jr., a purchasing agent of the Carnegie-Illinois Steel Corporation. This letter refers to certain essential specifications, advises the joint venturers that a contract would follow, and calls their attention to the fact that their bid included an offer to furnish a performance bond in the sum of $250,000, or in the alternative to deposit with the Carnegie-Illinois Steel Corporation certified checks amounting to $250,000, which the steel company would retain until satisfied that the work would be satisfactorily completed.

The same day that they were notified by the Carnegie-Illinois Steel Corporation that their bid had been accepted, the joint venturers, Taxpayer, A. Guthrie & Co., and John Marsch, Inc., executed two complementary agreements. The first, a joint venture agreement for the performance of the Irvin Mill project under the forthcoming Carnegie-Illinois Steel Corporation contract, was substantially a restatement, however with more formality and in greater detail, of the joint venture agreement entered into by the same parties the preceding April.

The Court feels constrained, even at the expense of being in some respects redundant, to call attention to the salient features of this second joint venture agreement. Paragraph 1 provides:

"It is the intention and purpose of the parties hereto that they shall act solely as joint adventurers and that there shall be no relation of, or liability among them as partners. No party hereto shall in any manner be liable or responsible for anything done or omitted by any other party hereto."

Paragraph 2 provides that the joint venturers shall organize the Guthrie-Marsch-Peterson Corporation for execution of the Carnegie-Illinois Steel Corporation contract. This paragraph specifies the organization and capital structure of the proposed corporation; names Chicago, Illinois, as the location of the general office; sets out the six corporate directors: H. L. Mundy, R. M. Knox, John Marsch, Nicolas Marsch, Edward Peterson and John Hershey; and the members of the Executive Committee: Nicolas Marsch, Edward Peterson and R. M. Knox. In paragraph 3, the joint venturers each agree to subscribe for 1000 shares of stock in the corporation and pay therefor $100.00 a share. The next two paragraphs make the following provisions for the assignment by the joint venturers of the forthcoming Carnegie-Illinois Steel Corporation contract to the proposed corporation:

"4. It is mutually agreed that forthwith upon the incorporation of the Corporation, then all right, title and interest of the parties hereto under the aforesaid bid and contract shall, to the extent permitted, be assigned and transferred to the Corporation, and that the Corporation shall be irrevocably authorized to collect, receipt for, and retain without further accountability, any and all payments of every kind and nature made by the said Carnegie-Illinois Steel Corporation pursuant to said bid and contract; and that in consideration thereof the Corporation shall undertake and agree to perform and discharge all obligations of the parties hereto pursuant to the aforesaid bid and contract.

"5. It is further expressly agreed that, as between the parties hereto, all obligations, duties, agreements and work to be kept and performed by the parties hereto under the terms and provisions of said bid and contract, shall, in all respects, be kept and performed by the Corporation, and in such manner as the Corporation may from time to time determine or direct; and that all acts and things done or omitted by the said Corporation in connection with the Project shall, for all purposes of said contract, be and be deemed to be the act or omission of the parties hereto."

Paragraph 6 of the agreement provides that the joint venturers must lease certain equipment to the Corporation and sets out the formula to be used in computing the rental to be paid by the Corporation for the use of this equipment. In paragraph 7, the joint venturers agree that—

"To the extent only that the Corporation is not authorized or empowered, under the terms of the aforesaid bid and contract to act for the parties hereto, then the parties hereto in respect thereof shall be bound by the written decision signed by a majority of the persons then constituting the Executive Committee of the Corporation, and the parties hereto agree to execute any and all contracts and other instruments and take all other action when so directed by a majority of the members of said Executive Committee."

Each joint venturer agreed in paragraph 8 to loan the Corporation one-third of the amount required by Carnegie-Illinois Steel Corporation as a cash performance bond. Interest on these loans at the rate of 7% per annum was to run from the date of maturity, June 1, 1938, only. In paragraph 9 it was provided that the directors and officers of the Corporation and the members of the Executive Committee were not to receive any salaries and were not to be reimbursed for traveling expenses or expenses in connection with maintaining general offices. However, if any one of the joint venturers were required to pay out its own funds in furtherance of the joint venture agreement or the Carnegie-Illinois Steel Corporation contract, the other joint venturers were required by paragraph 10 of the agreement to make a pro-rate contribution. The succeeding paragraphs make provision for the designation of successor members of the Executive Committee and for pro-rata distribution of the equipment owned by the corporation upon completion of the project. And in conclusion, the parties refer to the second agreement which they had entered into on this same day, the 15th of May, 1937.

This second agreement was a stock option contract of five years duration providing that if any of the joint venturers desired to sell any of their Guthrie-Marsch-Peterson Company stock and found a purchaser therefor, that the Guthrie-Marsch-Peterson Company would be given the exclusive right to purchase this stock for $100 a share. The agreement provided the manner in which the option had to be exercised and also contained provisions extending the option to stock of any of the joint venturers who were placed in bankruptcy, receivership, or who had made an assignment of the stock for the benefit of creditors, or whose stock had been levied upon by judicial process, or whose stock had been pledged as collateral security and was being sold to discharge the lien. The joint venturers agreed that notice of the stock option should be printed on all shares of stock issued to them.

Work on the Irvin Mill Project was commenced on May 17, 1937.

On May 19, 1937, the joint venturers, in keeping with their agreement, caused the Guthrie-Marsch-Peterson Company, a corporation, to be organized under the laws of the State of Delaware. The Certificate of Incorporation confers upon the corporation extremely broad, if not unlimited, powers relating principally, but not exclusively, to the general contracting business. The Certificate provides for perpetual corporate existence [1] and authorizes the issuance of

1. However, the corporate by-laws provided that the corporation's activities would not extend beyond construction of the Irvin Mill project under the Carnegie Steel contract.

$300,000 capital stock as agreed upon by the joint venturers.

On May 21, 1937, the joint venturers executed a waiver of their right to file a mechanics lien for or on account of work done for the Carnegie-Illinois Steel Corporation on the Irvin Mill Project.

On May 22, 1937, the Carnegie-Illinois Steel Corporation as party of the first part, and the joint venturers, as parties of the second part, entered into an extended and formal written contract which provided in detail the rights and obligations of the contracting parties with reference to the Irvin Mill Project. As an indication of the relationship and mutual rights and obligations which the parties intended to create by the contract, the Court calls attention to the substance of certain of the contract provisions. In effect the parties agreed: that the joint venturers would be jointly and severally liable for performance of the contract; that the joint venturers would furnish all transportation, equipment, materials and labor and perform all work necessary for completion of the excavations, foundations, grading and sewers for the Irvin Works steel mill; that the work would be done by the joint venturers in accordance with the specifications and drawings which were made a part of the contract; that the chief engineer of the Carnegie-Illinois Steel Corporation would have general supervision of the work and performance of the contract; that the Steel Corporation could make changes in the specifications and compensation for the work required would be altered accordingly; that the Steel Corporation would furnish certain materials at specified prices; that the joint venturers would provide facilities for, and afford the Steel Corporation ample opportunity to make, inspections of the work; that the Steel Corporation had authority to reject work which was unsound, improper or not in accordance with the specifications and drawings; that the joint venturers would comply with the building laws and regulations and acquire all necessary permits for construction, use and occupancy of the Irvin Works project; that the joint venturers would not sublet, subcontract, or assign any of the work without the consent of the Steel Corporation; that the joint venturers would protect the work completed and advise the Steel Corporation of the contemplated plans and methods of procedure for prosecuting the work; that the joint venturers would begin the work within five days, complete the work at the earliest date, and make no claim for extra compensation because of delays in the project; that certain existing gas lines were not to be disturbed; that the joint venturers would procure and keep in force the necessary accident, workmen's compensation, and other insurance; that the joint venturers assumed full responsibility for the work and were to bear all losses in connection therewith, whether from personal injuries, weather damage, patent infringement (except specified articles), or otherwise; that upon final completion of the work the Steel Corporation's named agent would make an inspection, and, if satisfied that the work complied with the requirements of the contract, execute a certificate of acceptance, and within 20 days thereof final payment would be made; that neither final payment nor the certificate of acceptance, was to be considered an acceptance of defective work; that if the joint venturers failed to fulfill, fully and effectively, the covenants contained in the agreement, they would be deemed to have defaulted and, upon notice, the Steel Corporation could rescind any and all covenants of the agreement and require the joint venturers to respond for the damages caused by their breach of the contract; that the joint venturers could not assign the contract without the written consent of the Steel Corporation; that a waiver of any covenant in the contract had to be in writing and properly executed; that the Steel Corporation should have notice and a right to settle all claims presented to the joint venturers which might be charged to the Steel Corporation; that, upon notice to the joint venturers, the Steel Corporation could delegate its authority under the contract; that disputes would be submitted to arbitration; and that securities having a total par value of $250,000.00 would be pledged by the joint venturers as security for performance of the contract.

In addition to the foregoing provisions of the contract, which have been set out only in substance, and very briefly at that, there were certain other provisions that must be considered in detail for the efficacious determination of this action. Section 10 of the May 22, 1937, agreement between the Carnegie-Illinois Steel Corporation and the joint venturers provides:

"Inasmuch as the Contractor (the joint venturers) consists of three separate corporations, said corporations shall immediately, in writing, appoint one competent person, satisfactory to the Superintendent, as sole and exclusive agent for said three corporations. Said agent shall have full and sole authority to act and to speak for, and shall be the sole and exclusive agent of, the said three corporations in any and all matters pertaining to the execution and performance of this contract. All instructions or directions given by the Steel Corporation, the Engineer and/or the Superintendent shall be sufficiently given, if given to said agent.

"Said agent shall give his personal attention and supervision constantly to the faithful prosecution of the work, and shall be present personally on the ground or readily available at all times.

"Any two of said three corporations at any time may revoke such appointment and appoint a new agent with similar powers, provided written notice of said revocation and new appointment is given to the Superintendent, and further provided the new appointee is a person satisfactory to the Superintendent. Until such new appointment of a person satisfactory to the Superintendent, the old appointment shall nevertheless continue and be effective despite any attempted revocation thereof.

"The Contractor will furnish to the Superintendent and the Engineer a written list of foremen in charge of the different kinds or character of work and of any others who will represent the Contractor in the performance of any portion of the work contemplated by this contract. The Contractor will notify the Engineer and the Superintendent in writing of any changes in or additions to said list of foremen."

With specific reference to an agent for the purpose of payment under the contract, the parties executed Section 38 of the agreement, which provides as follows:

"All payments required to be made by the Steel Corporation to the Contractor under the terms of this contract shall be sufficiently made by checks drawn against sufficient funds on deposit in any trust company, national or state bank, payable and mailed to *Guthrie Marsch Peterson Company* at *1307 Wrightwood Ave., Chicago, Illinois,* who is hereby appointed agent for and on behalf of the three corporations who are the parties of the second part hereto for the purpose of receiving said payments. All such checks, when honored by the drawee, shall be considered as payments as of the time of mailing. This appointment is not subject to revocation during the performance of this contract, and the Steel Corporation shall be absolutely protected by any such payment, without any responsibility or liability for the application or distribution of any payment so made."

The joint venturers were to be paid a certain rate for each unit of work completed. The contract enumerated the various proposed items of work in the whole project, listed the estimated units contained in each item and provided the unit price to be paid the joint venturers. For example, the contract provided for the excavation of 3,340,000 cubic yards above the yard level at the rate of $0.288 per cubic yard. The Court makes reference to this portion of the contract merely to indicate the manner by which the parties computed the compensation paid for the Irvin Mill construction work. Payments for the work were made periodically pursuant to Section 26 of the contract which provides:

"So long as the contractor is performing this contract agreeably to the provisions thereof, and with such prog-

ress and efficiency as shall be satisfactory to the Superintendent, the Engineer during the first week of every month will make an approximate estimate of the proportionate value of the work done and materials furnished hereunder by the Contractor up to and inclusive of the last day of the preceding month, based upon the unit prices set out in the Unit Schedule. The Engineer shall deliver copies of said estimate to the Contractor and to the Steel Corporation as soon as such estimate is completed. Ninety (90) per centum of the amount of said estimate, after deducting all previous payments shall be due and payable to the Contractor at the office of the Treasurer of the Steel Corporation, Pittsburgh, Pennsylvania, on or before the 15th day of the current month. The other ten (10) per centum of each and every such estimate shall be retained by the Steel Corporation until the final completion and acceptance of the work in accordance with the provisions of this contract and shall then be paid over to the Contractor as hereinafter provided. * * *"

The contract was amended in two respects by agreements executed this same date. First, details were added relating to the method of measuring the amount of excavation, the prices to be charged for certain materials and the inclusion of the cost of a security bond in the bid price. Second, the joint venturers were authorized to deposit cash in the sum of $83,400, in lieu of securities having that par value as partial security for performance of the contract. In this connection, it should be mentioned that the Edward Peterson Company, plaintiff herein, posted a cash bond in the sum of $83,400, in compliance with this provision of the contract.

By an agreement, also dated May 22, 1937, the joint venturers assigned to Guthrie-Marsch-Peterson Company

"all of their right, title and interest, in, to and under a certain contract between the undersigned (the joint venturers) and Carnegie-Illinois Steel Corporation, dated May 22, 1937, and covering the work of trading and constructing sewers and foundations for the new Irvin Mill at Irvin, Pennsylvania; giving and granting unto the said Guthrie-Marsch-Peterson Company, its successors and assigns, full power and authority to collect, receive and give acquittance of any sum or sums due or to become due under said contract and in the name of the said undersigned or otherwise to procure or withdraw any suit or proceeding at law or in equity therefor."

And the Guthrie-Marsch-Peterson Company agreed

"to assume and faithfully perform and discharge all the terms, covenants and obligations assumed or to be performed or discharged by the aforesaid assignors (the joint venturers) under said contract (with Carnegie-Illinois Steel Corporation) and to indemnify and hold harmless the said assignors on all covenants and obligations made by them in said contract."

On the same date, the Carnegie-Illinois Steel Corporation by a properly executed agreement in writing consented to the foregoing assignment with the limitation that

"the said assignment shall in no way affect, impair or prejudice any rights which Carnegie-Illinois Steel Corporation has or hereafter may have against the three (joint venturers)."

The contract for the Irvin Mill project, which was executed by the joint venturers and assigned to Guthrie-Marsch-Peterson Company, was actually performed by the Company (hereinafter referred to as GMP). Although GMP maintained its home office in Chicago, Illinois, where it kept its books of account and financial records, and carried on its correspondence, it also maintained an administration building and clubhouse at the Irvin Mill project where its directors and executive committee stayed and held meetings when working at the project. GMP maintained its own staff of engineers, supervisors, mechanics, laborers and officials, many of whom had been furnished by plaintiff (who, incidentally, furnished all of its employees

except one) and the other joint venturers. All of these employees were controlled and paid by GMP. It may be well to mention in this connection that except for the salary of Edward Peterson, president of the taxpayer corporation, the salaries of all employees, who were furnished for the Irvin Mill project by the taxpayer, were paid directly by, and from the funds of, GMP. The salary of Edward Peterson was paid by the taxpayer but it was charged to the Irvin Mill project and the reimbursement which the taxpayer received from GMP for expenses incurred on behalf of the Irvin Mill project included a reimbursement for the salary of Edward Peterson.

GMP operations were supervised by the Executive Committee, which consisted of one representative from each of the three original corporate stockholders (the joint venturers). All the powers of the Board of Directors of GMP were entrusted to this committee. The chairman of the Executive Committee was Nicolas Marsch of John Marsch, Inc. He was also the secretary-treasurer of GMP and his judgment in matters of accounting and finance was generally accepted by the other two members of the Executive Committee, Robert M. Knox of A. Guthrie & Co., and Edward Peterson of the plaintiff corporation.

Almost all the equipment used by GMP to start the Irvin Mill project was provided by each of the three joint venturers. However, the taxpayer, as well as the other joint venturers, received fair and standard rental payments in keeping with the April, 1937, agreement, as amended, for all equipment loaned to GMP. For example: during the fiscal year ended March 31, 1938, plaintiff received equipment rental payments totaling $123,030.30.

Shortly after the start of the Irvin Mill project GMP began to purchase its own equipment. In some instances the equipment purchased was in replacement of old equipment loaned to GMP by one of the joint venturers. When such old equipment was exchanged for new equipment, the new equipment became the asset of GMP and the corporate stockholder who had loaned the equipment received a credit for the trade-in or scrap value of the old equipment on the books of GMP. In other instances one of the three joint venturers would purchase new equipment which GMP needed for the Irvin Mill project and this new equipment would be turned over to GMP and the stockholder would be paid or receive credit for the purchase price. In still other instances GMP would purchase equipment or supplies directly from one of the joint venturers for use on the project. The evidence shows that on several occasions the taxpayer sold various items to GMP at a profit.

The April, 1937, agreement provided that the joint venturers, also the corporate stockholders, would be reimbursed for expenses incurred in connection with the Irvin Mill project. On December 18, 1937, the Board of Directors of GMP voted to reimburse the three corporate stockholders in the amount of $15,000, for services and expenses paid out by each of them from May, 1937, through December of the same year. An additional amount in the sum of $5,625 was voted for such expenses through March 31, 1938. These sums were actually so paid.

GMP acted as an independently functioning corporation with its own corporate interests. All the work done on the Irvin Mill project was performed by GMP and all payments made on the contract were made by Carnegie to GMP. Payments were made on the percentage of completion basis in accordance with a monthly engineering estimate of the percentage of work done toward completion of the project. Each month GMP prepared a monthly report showing its total receipts and disbursements. The income received by GMP from the Irvin Mill project was treated by GMP as its own income. All costs and expenses of the project were paid by GMP out of funds received by it from Carnegie and the profit remaining was reported by GMP as its own income for federal income tax purposes.[2] GMP was on the completed project

2. It should be noted that the GMP income on the Carnegie contract which the taxpayer seeks to include in its excess profits credit for its fiscal year ended

basis for federal income tax purposes and reported no gross income on its federal income tax return for the fiscal year ended March 31, 1938. For its fiscal year ended March 31, 1939, GMP reported on its federal income tax return a gross income of $1,724,491.51, net income of $1,246,503.24, and total income and declared value excess profits taxes of $212,406.62. For its fiscal year ended March 31, 1940, GMP reported a total gross income of $563,672.32, net income of $360,579.40, and total income and excess profits taxes due the federal government of $68,510.09.

Most of the construction work by GMP under the Carnegie contract was completed by March, 1939, but because of necessary adjustments final settlement was not made until June of that year and final payment was entered on the books of GMP sometime in October, 1939.

The Carnegie Contract was not the only one performed by GMP. While GMP was still working on the Irvin Mill project, it became interested in bidding upon other construction projects. In August, 1938, GMP was invited to bid upon the Prado Dam in California by the United States Army Engineers. On September 16, 1938, a special meeting of the stockholders of GMP held at Los Angeles, California, modified the by-laws of GMP to include the Prado Dam within the allowable activities of GMP. On September 23, 1938, a contract was entered into between the United States of America, GMP and certain other joint venturers for construction work at the Prado Dam, California; and work commenced on the project immediately, with payments under the contract extending from November 13, 1939, to October 27, 1941.

After beginning construction at the Prado Dam project in California, GMP was awarded the first of a series of construction contracts for the Pennsylvania Turnpike, for which work commenced on March 14, 1939, with payments under the several contracts extending from May 3, 1939, through December 23, 1940. On May 5, 1939, another special meeting of the stockholders of GMP was held to modify further the by-laws of GMP to include authorization for engaging in the Pennsylvania Turnpike projects.

The plaintiff was a stockholder in GMP until December 19, 1942, when both plaintiff and A. Guthrie & Co., Inc., sold their one-third stock interests in GMP to Mr. Nicolas Marsch of John Marsch, Inc., so that all of the outstanding stock was then owned by Nicolas and John Marsch. At this time GMP filed a certificate of amendment of its articles of incorporation changing its name from "Guthrie-Marsch-Peterson Company" to "Marsch Construction Company (Delaware)" and the new Marsch construction company continued to retain and use the original charter rights and corporate form of the old GMP and was treated as the successor to GMP for federal tax purposes.

The total profit of GMP from the Carnegie contract was in the neighborhood of $1,330,000 (after taxes). GMP declared $975,000 in dividends. $325,000 in dividends were distributed to each of the three corporate stockholders as follows:

December 18, 1937 .........$100,000.00 [3]
March 22, 1938 ........... 125,000.00 [4]
October 24, 1938........... 100,000.00

The taxpayer received a distribution from GMP of $225,000 during taxpayer's fiscal year ended March 31, 1938, and $100,000 during its fiscal year ended March 31, 1939. These distributions were entered in an account on the books of the taxpayer entitled "dividends". During its fiscal year ended March 31, 1938, the taxpayer reported the $225,000 in its federal corporate income tax

March 31, 1952, was included in the excess profits credit of GMP itself in its own fiscal year ended March 31, 1942.

3. This dividend distribution was made in the form of a $100,000 note to the taxpayer dated December 23, 1937, bearing interest at 5%. The $100,000 note was

paid by GMP on March 19, 1937, together with $1,194 interest to the taxpayer.

4. This dividend distribution was made in the form of a $125,000 note bearing interest at 5% dated March 22, 1938,
• which note was paid June 25, 1938, with interest in the amount of $1,632.50 to the taxpayer.

return (Form 1120, 1937) in schedule F as "Income from Dividends". In this same federal tax return, the taxpayer took a deduction of $191,250 representing 85% of the $225,000 GMP distribution which was claimed under the statutory 85% "Dividend Received Credit" allowed by the Internal Revenue Code at that time (See Item No. 10, Form 1120, 1937). The $100,000 GMP distribution received by the taxpayer corporation on October 24, 1938, was listed on the taxpayer's federal corporate income tax return (Form 1120, 1938) on Schedule G as "Income from Dividends" and the taxpayer also claimed, and was allowed, a dividends received credit which served to reduce its taxable net income for that year. See Form 1120, 1938, Schedule B, Items Nos. 31 and 32.

At the time the $325,000 in distributions were made both GMP, the distributing corporation, and the taxpayer, the receiving stockholder corporation treated the distributions as dividends. For each of the fiscal years during which the beforementioned dividends were declared, the taxpayer had an annual auditor's report of its books and records. The auditor's report for the fiscal year ended March 31 1938, shows the $225,000 GMP distribution as a dividend item. The report for the fiscal year ended March 31, 1939, similarly shows the $100,000 GMP distribution as a dividend item.

As stated before, on or about June 15, 1942, the plaintiff filed its corporation income and declared value excess profits tax return (Form 1120) together with its personal holding company tax return (Form 1120H) for its fiscal year ended March 31, 1942, showing an adjusted net income for federal income tax purposes on Form 1120 of $95,692.13, and an income tax liability of $24,188.14, which amount was duly paid and is not involved in this action. No excess profits tax return (Form 1121) was filed by the plaintiff for its fiscal year ended March 31, 1942, at the time that the two other returns, Forms 1120 and 1120H, were filed.

Thereafter, an audit and investigation was made by the Bureau of Internal Revenue as to the possible excess profits tax liability of the plaintiff and a report was prepared by the revenue agent dated December 24, 1947, in which a total tax deficiency was proposed against the plaintiff for its fiscal years ended March 31, 1941, and March 31, 1942, in the amount of $79,560.42. Of this $79,560.42 deficiency, the amount of $47,995.35 was a proposed deficiency in the excess profits tax due from the plaintiff for its fiscal year ended March 31, 1942. (This $47,995.35 figure was adjusted on the Revenue Agent's Report dated July 29, 1948, to an excess profits tax deficiency of $44,254.14.) The remaining amount of the total $79,560.42 deficiency proposed on December 24, 1947, consisted of a deficiency in the income tax of the plaintiff for March 31, 1942, and in certain other taxes of the plaintiff, all of which remaining deficiencies are not involved in this action. By letter dated February 27, 1948, the plaintiff was advised by the Internal Revenue Agent in Charge, Omaha, Nebraska, that proposed deficiencies were being considered and that the plaintiff would be entitled to file a protest against the proposed deficiencies within a period of thirty days.

On March 25, 1948, the plaintiff filed an excess profits tax return (Form 1121) for its fiscal year ended March 31, 1942, showing thereon an excess profits net income of $65,931.66 and an excess profits credit of $33,523.05, with a resulting excess profits tax liability of $9,963.44. On the excess profits tax return Form 1121 filed by plaintiff for its fiscal year ending March 31, 1942, the plaintiff computed its excess profits credit under each of the two alternative methods. The plaintiff in such return computed its excess profits credit based on invested capital as $33,523.05, and its excess profits credit based on average earnings as $25,385.38. Such $25,385.38 credit under the average earnings method was computed by the plaintiff on the return (Form 1121) filed by the plaintiff on March 25, 1948, by treating the $325,000 received by plaintiff from GMP as dividends and consequently such dividends were not included in determining the average earnings for the period in question. After computing its excess profits credit under the two methods, the plaintiff used the invested capital excess

profits credit in computing the excess profits tax shown on such return in the amount of $9,963.44.

After filing its excess profits tax return Form 1121 for its fiscal year ended March 31, 1942, the plaintiff filed a protest on June 28, 1948, and requested a conference as to the proposed deficiency mentioned in the letter from the Internal Revenue Agent in Charge dated February 27, 1948. The February 27, 1948, deficiency letter enclosed a copy of a Revenue Agent's Report dated December 24, 1947, and was based on the following adjustments:

| | |
|---|---:|
| Accrued equipment rental | $ 43,333.28 |
| Excessive depreciation | 11,290.02 |
| Accrual capital stock tax | 1,915.00 |
| Increase in share, Marsch-Peterson-Walker Joint Venture | 1,408.10 |
| Increase in share, Marsch-Peterson-Walker-Condon Joint Venture | 59,705.42 |
| | 117,651.82 |
| Deduct capital gains | 1,861.97 |
| Net Increase Adjustment | 115,789.85 |
| Returned Net Income | 95,692.13 |
| Total Corrected Net Income | 211,481.98 |

The excess profits net income of the plaintiff was increased from $65,931.66, as reported by plaintiff on its Form 1121 return filed March 25, 1948, to the corrected amount of $182,554.05. A conference was held on July 21, 1948, in the office of the Internal Revenue Agent in Charge, Omaha, Nebraska. As a result of such conference the plaintiff was allowed a small amount of additional depreciation in accordance with a Revenue Agent's Report dated July 29, 1948. As a result of the conference the corrected net income of the plaintiff became $204,971.37 instead of the figure of $211,481.98 as previously corrected by the Revenue Agent's Report dated December 24, 1947. None of the adjustments in the net income or the excess profits net income of the plaintiff for the fiscal year ended March 31, 1942, is now in dispute in this action. As a result of the above mentioned confer-

ence and final adjustments, deficiencies of $44,254.14 excess profits tax and $20,157.78 income tax, together with deficiency interest of $18,448.13 and $5,636.35, respectively, were assessed. It is the $44,254.14 excess profits tax deficiency together with excess profits tax deficiency interest of $18,448.13 paid thereon which the plaintiff now seeks to recover.

When the revenue agent made the audit and investigation of the above mentioned return, such audit and investigation resulted in a substantial increase in the net income and excess profits net income of the plaintiff, as indicated above; the same audit, however, resulted in only a minor change in the excess profits credit of the plaintiff based on the invested capital method. According to the return, such credit based on invested capital as computed by the plaintiff was $33,523.05; the computations and report of the revenue agent reached a figure of $32,195.52 as the excess profits credit based on invested capital.

In its own excess profits tax return for the fiscal year ended March 31, 1942, the plaintiff computed its excess profits credit based on the average earnings method to be $25,385.38. In computing the $44,254.14 deficiency, the revenue agent used the same figure ($25,385.38) as the plaintiff's excess profits credit under the average earnings method. Since the excess profits credit based on the average earnings method as originally reported by the plaintiff and as computed by the revenue agent ($25,385.38) was less than the excess profits credit based on invested capital as computed by the revenue agent ($32,195.52), the $25,385.38 credit based on the average earnings method was not used as the excess profits credit in the agent's computation of the $44,254.14 excess profits tax deficiency.

### Discussion

■ This case arises under the Excess Profits Tax Act of 1940, Title II of the Second Revenue Act of 1940, c. 757, 54 Stat. 975, 26 U.S.C. (1946 Ed.) 710–736, 740–752 incl. One of the main objectives in imposing an excess profits tax is to reach corporate profits which have been swollen by the increased tempo of a garrison econo-

my. An excess profits tax selects for additional tax those corporations whose profits are higher than they would have been in the absence of hostilities and a large military budget.[5] The excessive profit, upon which the tax is levied, is determined by taking the net profit during the tax year and subtracting therefrom a figure which represents, in some measure at least, what would have been the normal profit. This is accomplished by taking the normal tax net income (with certain adjustments not herein material) and subtracting therefrom the following:

1) the specific exemption, which is not in dispute in this action;

2) The excess profits tax credit (the figure which, in some measure at least, represents normal earnings); and

3) the unused excess profits tax credit, which, like the specific exemption, is not the subject of dispute in this case. See 26 U.S.C.A. §§ 710(b) and 711. The excess profits tax credit, the sole disputed matter in this case, could, under the 1940 Revenue Act, be computed either one of two ways: 1) the invested capital method; or 2) the average income method. 26 U.S.C.A. §§ 712, 713 and 714. Under the invested capital method a taxpayer was allowed a credit equal to a certain percentage (5 to 8%) on its invested capital. 26 U.S.C.A. § 714. Thus, normal earnings were, in a sense at least, determined by allowing a standard rate of return on invested capital. However, for the purposes of this action, the taxpayer does not rely on this method of computing its 1942 excess profits tax credit. Its claim hinges upon the second method of computing the excess profits tax credit —the average income method.

■ Under Section 713, Title 26 U.S.C. A., taxpayer was entitled to an excess profits tax credit equal to 95% of the "average base period net income" with certain adjustments for capital additions and reductions not herein material. The "average base period net income" is defined as the average of the "excess profits net income" of the taxpayer for the "base period" (1936 through 1939). The "excess profits net income", in turn, is defined as the "normal-tax net income" with certain adjustments. One of the adjustments is that "The credit for dividends received shall apply, without limitation, to dividends on stock of domestic corporations". 26 U.S.C.A. § 711(b) (1) (G). The effect of this provision, both parties concede, is to compel the exclusion of dividends received from domestic corporations in computing the average earnings for the base period. However, counsel for the taxpayer contends that the $325,000.00 distributions received by the taxpayer from GMP were not dividends and consequently should not be excluded in computing the credit. His contention in this respect seems to be two-fold: first, the distributions were not dividends because GMP was merely an agent of the joint venturers or conduit through which the money passed to the taxpayer; and second, the distributions could not be dividends in a tax sense because GMP had no earnings or profits from which (taxable) dividends could be declared. The first aspect of counsel's contention is factually untenable and the second aspect is, in this case at least, legally unsound.

In this case there was no actual contract of agency between GMP and the joint venturers; nor were the usual incidents of an agency relationship present. GMP did not bind the joint venturers except insofar as they were already bound by their own contract which they had assigned to GMP. The income of GMP was attributable to its own employees and to assets either owned or rented by it. The control which the joint venturers exercised over GMP was no different than the control which the sole stockholders would exercise over any corporation; and the relationship of GMP to the joint venturers was in fact that of corporation to stockholders and not agent to principal. Nothing in the evidence indicates that it was the business purpose of GMP to carry on the normal duties of an

---

5. Although not necessary nor material to the decision of this case the purpose of an excess profits tax is set out in the Legislative History of the Korean War Excess Profits Tax Act. See 2 U.S.Code Cong.Serv. 81st Cong., 2 Sess., 1950, pp. 4027–4028.

agent. Consequently the Court is persuaded by a strong preponderance of the evidence that GMP was not, in fact, the agent of the joint venturers. National Carbide Corporation v. C. I. R., 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779, 10 A.L.R.2d 566; Moline Properties v. C. I. R., 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499.

As to the second point made by counsel for the taxpayer that the $325,000 could not be dividends because GMP had no earnings or profits from which to declare dividends, it need only be mentioned that then the $325,000 would have to be a return of capital or a capital increment (capital gain) and in either case it would be excluded in determining the excess profits tax credit. 26 U.S.C.A. § 711(b) (1) (B).

In view of what has been said the taxpayer's claim is without merit. Counsel for the government shall prepare and submit for approval the appropriate judgment to enter in accordance with this memorandum.