**EDWARD PETERSON COMPANY, a Corporation, Appellant,**

v.

**George W. O'MALLEY, Collector of Internal Revenue, Appellee.**

**No. 15012.**

United States Court of Appeals
Eighth Circuit.

Oct. 15, 1954.

William J. Hotz, Omaha, Neb. (William J. Hotz, Jr., Omaha, Neb., was with him on the brief), for appellant.

Harry Marselli, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson and David O. Walter, Sp. Assts. to the Atty. Gen., and Donald R. Ross, U. S. Atty., Omaha, Neb., on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and COLLET, Circuit Judges.

COLLET, Circuit Judge.

The question for determination is whether money received by the taxpayer corporation from another corporation during the years 1937 and 1938 constituted income of the taxpayer or was "dividends" received by the taxpayer "from a domestic corporation" within the meaning of the Revenue Act of 1940. 26 U.S.C. (1946 Ed.) § 711(b) (1) (G).[1] The significance of the question lies in the fact that under the Revenue Act of 1940 if the money received by the taxpayer in 1937 and 1938 was earned "income" of the taxpayer in the taxpayer's business, it would be included as such as a part of the taxpayer's normal earnings during the "base period" 1936–1939, inclusive, and excess profits taxes levied by the 1940 Act would, for years subsequent to the passage of the 1940 Act, with certain adjustments and deductions, be collected on the amount of the taxpayer's income in excess of the normal earnings of the taxpayer during the

1936–1939 base period. If, however, the money constituted a dividend from a domestic corporation within the meaning of § 711(G), supra, it is conceded that it could not be treated as a part of the taxpayer's normal income during the base period and the "excess" profits of the taxpayer under the 1940 Act would be correspondingly higher. The excess profits tax for the year 1942 alone is now involved, although the excess profits tax for other subsequent years will be affected by the decision in this case.

It should be observed at the outset that the question is not whether the money received by the taxpayer in 1937 and 1938 was subject to taxation or whether the income tax on the money was more properly paid by the distributing corporation or by the distributee taxpayer corporation. The question is whether the money was actually a part of the taxpayer's earnings during the base period, and should be treated as such in determining the taxpayer's "excess" earnings during the years subsequent to the 1940 Act, over and above the normal or "base period" earnings during the 1936–39 base period. At the risk of an oversimplification of the complex calculations and multitudinous factual details presented by the record, we undertake to state only the salient facts necessary to demonstrate and clarify the issue presented.

The taxpayer, Edward Peterson Company, had, for a number of years prior to 1937, been engaged in the general contracting business at Omaha, Nebraska, on a comparatively small scale. Early in 1937 the Carnegie-Illinois Steel Corporation (which we shall refer to as Carnegie) was about to receive bids for the construction of a large steel plant in the State of Pennsylvania. The Peterson Company desired to bid on the project but felt that the job was too large for it to undertake alone. An arrangement

---

1. 711(b) (1)—"The excess profits net income for any taxable year * * * shall be the * * * net income * * *. * * * the following adjustments shall be made * * *:

\* \* \* \* \* \*
"(G) Dividends Received. The credit for dividends received shall apply, without limitation, to dividends on stock of domestic corporations".

was worked out between the Peterson Company and two other contractors, the A. Guthrie & Co. corporation and the John Marsch, Inc., corporation for the three to bid on the project as a joint venture. A written memorandum agreement was made in April, 1937, to that effect. Their bid was made and accepted by Carnegie. Carnegie knew that the bid was a joint one made by the three contractors as joint venturers. Carnegie prepared a written contract in which it was provided that inasmuch as the so-called Contractor consisted of three separate corporations as joint venturers, the three should appoint—"one competent person * * * as sole and exclusive agent for said three corporations," with full authority to act for all. This requirement was made by Carnegie for its convenience and protection. The joint venturers decided to form a corporation, assign the contract, yet to be formally executed with Carnegie, to that corporation, and have that entity act for the three contractors. Carnegie agreed. The corporation was formed under the name of Guthrie-Marsch-Peterson Company. For brevity we shall refer to it as GMP. The contract was formally executed between Carnegie and the three joint venturers in May, 1937. Therein "Contractor" was defined as follows: "Contractor means said A. Guthrie & Co., Inc., John Marsch, Inc., and Edward Peterson Co., (said three companies being the parties of the second part hereto)." The contract then provided that:—

> "the Contractor * * * shall and will perform all work necessary for the completion of the excavations, foundations, grading and sewers for a steel mill known as the Irvin Works of the Steel Corporation, in accordance with the terms of this contract."

The contract expressly provided that each of the three joint venturers was jointly and severally obligated to the performance of all of its covenants. They were never released from that obligation.

Although the contract as executed retained its original language that one competent *"person"* be designated as the sole agent, it contained a paragraph near the end (apparently added after the original draft was prepared) recognizing and accepting the new corporation—GMP—as the agent of the joint venturers. The language used was:

> "All payments required to be made by the Steel Corporation [Carnegie] to the Contractor [the joint venturers] under the terms of this contract shall be sufficiently made * * * to Guthrie Marsch Peterson Company * * * who is hereby appointed agent for and on behalf of the three corporations who are the parties of the second part * * *. This appointment is not subject to revocation during the performance of this contract * * *."

The construction contract was assigned to GMP by the three contractors, and GMP agreed among other things—

> "to assume and faithfully perform and discharge all the terms, covenants and obligations assumed or to be performed or discharged by the aforesaid assignors (the joint venturers) under said contract (with Carnegie-Illinois Steel Corporation) * * *."

The incorporation of GMP provided for the issuance of 3,000 shares of stock with a par value of $100.00 each. Each of the three joint venturers had agreed to and did take 1,000 shares and each paid into GMP $100,000.00. Each put into the venture its own equipment in approximately equal amounts. As the amount of equipment each furnished was not exactly equal or the type exactly the same, each of the joint venturers leased its equipment to GMP at standard reasonable rentals. It was agreed that the equipment should be returned to each at the completion of the job. Actually in some instances individual pieces of equipment were sold by the joint venturers to the corporation. Some new equipment was purchased by the corpo-

ration. At the completion of the work the equipment was divided into three as near equal lots as possible and the division was accomplished by the three joint venturers drawing lots therefor. GMP had no assets whatever except the contributions made to it by the joint venturers. All money paid by Carnegie on the contract of the joint venturers—the contractors—was paid to GMP. But GMP received no money whatever other than the payments made to it by Carnegie on account of the contract between Carnegie and the three contractors for the work of the contractors in carrying out that contract. The work continued through 1937 and until late in 1938. Final settlement was made by Carnegie early in 1939. All expenses of the work were paid by GMP. All payments for the work were made on the percentage-of-completion basis on the engineer's monthly estimates. The bylaws of the corporation provided that its activities and powers were limited to this one job.[2] Its offices were in the Chicago office of the Marsch Company.

■ In December, 1937, payments from Carnegie had exceeded costs to such an extent that, absent unforeseeable contingencies, profits of $300,000.-00 had accrued. The board of directors and all the officers and executives of GMP consisted of the officers and executives of the three corporate joint venturers. The stockholders of GMP, as heretofore stated, consisted entirely of the three joint venturers in equal amounts to each. December 18, 1937, GMP distributed $300,000.00 in equal parts of $100,000.00 to each of the three joint venturers. March 22, 1938, a further distribution was made of $125,000.-00 to each joint venturer. October 24, 1938, a third distribution of $100,000.00 was made to each. These distributions were recorded as "dividends" on GMP's books. The taxpayer's vice-president testified that that designation of the distributions was used for want of a better name. Neither he nor anyone then connected with the operation of GMP was an expert accountant. At that time there was no particular significance, for tax purposes, whether the distributions were called dividends or income. GMP paid taxes on all the profits as its income. The taxpayer, in its income tax returns for those periods, treated the payments as the income of GMP upon which income taxes had been paid by GMP and took the credit allowed by law on that theory. The propriety of that course of action is not now involved. Evidence of the course of action was material for what it was worth as evidence of the understanding the taxpayer had of the legal, technical nature of the distributions. The Revenue Act of 1940, creating the present significance of the term, had not then come into existence.

When the Excess Profits Tax Act of 1940, Title II of the Second Revenue Act of 1940, c. 757, 54 Stat. 975, 26 U.S.C. (1946 Ed.) § 710 et seq., was enacted, as the trial judge very aptly states— [113 F.Supp. 371] "One of the main objectives in imposing an excess profits tax is to reach corporate profits which had been swollen by the increased tempo of a garrison economy. * * * The excessive profit, upon which the tax is levied, is determined by taking the net profit during the tax year and substracting therefrom a figure which represents, in some measure at least, what would have been the normal profit." The normal profit was ascertained, as the trial court stated,—

"by taking the normal tax net income (with certain adjustments not herein material) and subtracting therefrom the following:

*　*　*　*　*　*

"2) the excess profits tax credit (the figure which, in some meas-

2. When this project was completed, the three joint venturers continued to act together on several other projects through this corporation and in each in- stance amended the bylaws to include the new project. Marsch finally took over the one-third interest of Guthrie and Peterson in 1943.

ure at least, represents normal earnings) ;

\* \* \* \* \* \*

"The excess profits tax credit, the sole disputed matter in this case, could, under the 1940 Revenue Act, be computed either one of two ways: 1) the invested capital method; or 2) the average income method. 26 U.S.C. (1946 Ed.) §§ 712, 713, 714. Under the invested capital method a taxpayer was allowed a credit equal to a certain percentage (5 to 8%) on its invested capital. 26 U.S.C. (1946 Ed.) § 714. Thus, normal earnings were, in a sense at least, determined by allowing a standard rate of return on invested capital. However, for the purposes of this action, the taxpayer does not rely on this method of computing its 1942 excess profits tax credit. Its claim hinges upon the second method of computing the excess profits tax credit—the average income method.

■ "Under Section 713, Title 26 U.S.C. (1946 Ed.), taxpayer was entitled to an excess profits tax credit equal to 95% of the 'average base period net income' with certain adjustments for capital additions and reductions not herein material. The 'average base period net income' is defined as the average of the 'excess profits net income' of the taxpayer for the 'base period' (1936 through 1939). The 'excess profits net income', in turn, is defined as the 'normal-tax net income' with certain adjustments. One of the adjustments is that 'the credit for dividends received shall apply, without limitation, to dividends on stock of domestic corporations.' 26 U.S.C. (1946 Ed.) § 711(b) (1) (G). The effect of this provision, both parties concede, is to compel the exclusion of dividends received from domestic corporations in computing the average earnings for the base period. However, counsel for the taxpayer contends that the $325,000.00 distributions received by the taxpayer

from GMP were not dividends and consequently should not be excluded in computing the credit. His contention in this respect seems to be two-fold: first, the distributions were not dividends because GMP was merely an agent of the joint venturers or conduit through which the money passed to the taxpayer; and second, the distributions could not be dividends in a tax sense because GMP had no earnings or profits from which (taxable) dividends could be declared."

GMP was operated by the joint venturers as an independently functioning corporation. Its sole activity was, however, the activity and efforts of the three joint venturers acting in concert in the prosecution of the work contracted for under the Carnegie contract, for which the joint venturers continued to be jointly and severally responsible.

In June, 1942, after the excess profits tax feature of the Revenue Act of 1940 had become effective, Peterson, the present taxpayer, filed its corporation income and declared value excess profits tax return (Form 1120). No excess profits tax return (Form 1121) was then filed for its fiscal year ending March 31, 1942. An investigation was thereafter made by an agent of the Bureau of Internal Revenue. December 24, 1947, a report of that investigation was made, showing an excess profits tax due from Peterson for the year 1942 in the amount of $44,251.14. Peterson was advised that it might protest the assessment. March 25, 1948, Peterson filed an excess profits tax return (Form 1121) for the fiscal year ending March 31, 1942, in which it treated the distributions of $325,000.00 made in 1937 and 1938 as "dividends" (not as income). Its excess profits tax credit allowable under the average income method of computing that credit under § 713, 26 U.S.C. (1946 Ed.) § 713, being less than its excess profits tax credit would be under the alternative invested capital method provided for in § 714, 26 U.S.C. (1946 Ed.) § 714, it chose the latter credit. Upon that basis Peterson showed an excess

profits tax owed for the fiscal year ending March 31, 1942, of $9,963.44, as compared to the figure of $44,251.14 fixed by the agent. Peterson asked for a conference on the agent's proposed assessment. The conference resulted in the fixing of the excess profits tax at $44,-254.14 and deficiency interest thereon at $18,448.13.

The accountant who made up the 1942 excess profits tax return for Peterson explained that the reason he then treated the 1937 and 1938 distributions made to Peterson by GMP as dividends was because Peterson's books characterized them as dividends and he had not examined the contracts relating to the Carnegie project. The assessed excess profits taxes of $44,254.14 and interest of $18,448.13 were paid by Peterson under protest. Shortly thereafter the accountant's attention was called to the contracts relating to the Carnegie project. A claim for refund was made upon the ground that the distributions were not dividends within the meaning of § 711 (G) and therefore the base period excess profits tax credit should include those receipts as income of Peterson. That claim was rejected and this action was brought to recover the payments. No procedural questions are involved.

The trial court held, D.C., 113 F.Supp. 361, 368, that the distributions were "dividends" within the meaning of § 711(G). It found that GMP "acted as an independently functioning corporation with its own corporate interest." Upon the authority of National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779, and Moline Properties v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, the conclusion was reached that it was not the agent of the joint venturers and that therefore the income from the Carnegie contract should be treated as the income of GMP.

In our judgment the above cited cases have been misapplied in this case. Our problem here is not to determine whether the corporate existence of GMP is to be disregarded for the purpose of determining whether that corporation is subject to the payment of taxes on monies received by it. GMP paid taxes on all money it received from Carnegie after payment of the cost of the work contracted for by the joint venturers. Those taxes were paid on the net lump sum. Then the remainder of the net lump sum was distributed in equal parts to the joint venturers. The joint venturers then paid taxes on 15% of the one-third received by each. The corporate existence of GMP for its tax purposes was therefore not ignored but was fully recognized and complied with. The question we must determine is what should be considered as the income of the taxpayer in the base period 1936–1939. That involves a construction of the pertinent portions of the Revenue Act of 1940 for an entirely different purpose than would be involved if the question was whether money received by GMP was to be taxed as its income.

The excess profits tax credit now in dispute is arrived at by considerable circumlocution. Simplified as much as possible, the statutory method to be followed is based upon the determination of net income, either "normal tax" net income or "special class" net income, and, in either case, deducting therefrom as a credit dividends received on stock of domestic corporations. Section 711 (b) (1) (G) heretofore quoted. The theory and objective of those provisions was to separately treat income earned directly or primarily by the taxpayer from that earned by a corporation and received by him in the form of dividends of that corporation. When the excess profits tax credit was to be computed the same basic distinction was applied. In effect it amounts to a statutory direction that in determining the normal earnings of a taxpayer during the base period 1936–1939, only income earned directly by him shall be included, and income received in dividends from a domestic corporation, earned by that corporation and not directly or primarily earned by the taxpayer, should be excluded. That distinction between the two classes of income is entirely con-

**104**

sistent with the purpose to be accomplished in determining a taxpayer's average normal income produced by his own efforts during a given base period for comparison with his subsequent "excessive" earnings occasioned, as the trial court expressed it, "by the increased tempo of a garrison economy." The earnings of the taxpayer in either the base period or the subsequent period of inflated earnings should be, under both the letter and spirit of the law, the actual earnings of the taxpayer.

 Was the money received by the taxpayer from the Carnegie project actually directly and primarily the earning of the taxpayer? Considerable emphasis has been given to the fact that at the time of its distribution and receipt it was characterized and treated as dividends from GMP. It is argued, in effect, that it having been so treated by the taxpayer we should so treat it. But at that time there was little if any significance, tax-wise, to its characterization other than a possible tax disadvantage to the ultimate recipients. We have frequently held that the mere form of a transaction or the terminology used will not be controlling for tax purposes. And we will not now say that the formal characterization of a transaction or the terminology used by a taxpayer will serve to determine a taxpayer's tax liability. The fact, as found by the trial court, that GMP acted as an independently functioning corporation is not necessarily controlling under the circumstances and for the purposes of this case. Assume that the money received by GMP was the income of GMP for the purposes of taxation of GMP, and technically the money it distributed to the taxpayer was, under corporation law or the common usage of the term, "dividends" of GMP. It could still be the income of the joint venturer and treated as such if in truth and in fact it was directly and primarily earned by the joint venturer. If the joint venturer chose to operate through a corporation, the result can be and has been taxation of the same income twice. Moline Properties

v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132. But the mere fact that the same income may be twice taxed as the income of both the corporation and the ultimate recipient need not in every case destroy its identity as the primary income of one.

Under the facts of this case GMP was merely the conduit or agency through which the joint venturers carried out their contract with Carnegie by their own concerted efforts. That arrangement did not eliminate any tax liability of GMP, National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, but it does not destroy the identity of the funds received as the income of the Peterson Company for the purpose of determining what that company earned by its own efforts during the base period. Those receipts of $325,000.00 should have been included in the earnings of the taxpayer during the base period for the purpose of determining the taxpayer's excess profits credit.

The cause is reversed and remanded for such further proceedings as may be appropriate, consistent herewith.