Virtue Bros. Mfg. Co. v. Commissioner.
Virtue Bros. Mfg. Co. v. Commissioner
Docket No. 70675.
United States Tax Court
T.C. Memo 1960-256; 1960 Tax Ct. Memo LEXIS 32; 19 T.C.M. (CCH) 1448; T.C.M. (RIA) 60256; November 30, 1960
Sidney R. Reed, Esq., 608 S. Hill Street, Los Angeles, Calif., for the petitioner. Michael P. McLeod, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax of $46,065.05 for the taxable year ended March 31, 1954. The question presented is whether the petitioner is entitled to a deduction of $89,912.52 as a result of the termination of its business relations with another corporation, Fairway Mfg. Co.
Findings of Fact Some of the facts *33 were stipulated and the stipulations are incorporated herein by reference. The petitioner is a California corporation, incorporated in 1946 to succeed to the business of a partnership of similar name and personnel which had commenced business in 1926. Its office and principal place of business is located in Los Angeles, California. It filed a timely corporation income tax return for the year in question with the director of internal revenue at Los Angeles, California. It kept its books and filed its return on an accrual method of accounting and on the basis of a fiscal year ended March 31, 1954. The stock of the petitioner was and is wholly owned by either Philip M. Virtue or Philip & Tecla Virtue Foundation. It is in the business of manufacturing metal household furniture, principally dinette tables and chairs. The petitioner had been expanding eastward since 1946 and had established warehouses in Minneapolis and St. Louis. In the early part of 1952 it decided that it would be advisable to have a manufacturing operation in the Middle West or the East. Some of the materials which petitioner used came from the East or Middle West, and it was thought that by having a manufacturing *34 plant near the source of supply there would result a saving in the freight costs. It was also thought that various parts might be purchased from other manufacturers for assembly, thus saving cost of freight. A discussion was had between Philip Virtue and petitioner's attorney as to what type of organization should be utilized. It was decided that a corporation would be set up in the Middle West. One of the reasons for setting up a corporation was to permit six key employees of petitioner to invest therein. These employees were Peck, the vice president, Von Draska, sales manager, Skidmore, plant manager, Goff, production engineer, Hilliard, purchasing agent, and William I. Parke, treasurer. After some discussion among Philip Virtue and the six key employees it was decided to create a new corporation. Accordingly, on February 11, 1952, Philip Virtue and the six employees organized Fairway Mfg. Co., a California corporation, hereinafter referred to as Fairway, whose plant was to be located in Sandwich, Illinois. The total capitalization of Fairway was $25,000, which was paid in by the stockholders. Each of the six employees of petitioner subscribed to 8 per cent of the stock and Philip *35 Virtue subscribed to 52 per cent. It was provided with respect to such stock that in the event of the death of a stockholder or if a stockholder's employment with the petitioner should be terminated, except by retirement, his stock should be offered for sale to Fairway at book value. If Fairway should fail to accept within 15 days the same offer was to be made to the petitioner. If the petitioner failed to accept within 15 days, then the stock could be sold to any other person. It was also provided that no stockholder should voluntarily sell or dispose of any of his stock without offering it for sale at book value first to Fairway and second to petitioner. Philip Virtue, who was president of petitioner, became president of Fairway and each of the officers of petitioner became corresponding officers of Fairway. The function of Fairway was intended to be the manufacture of products which would be purchased and distributed by petitioner in the Middle West and East. An understanding was reached among Philip Virtue and the six employees that the petitioner would take all of the production of Fairway and that the petitioner would pay Fairway the cost of production, plus a reasonable *36 profit therefor. It was on this understanding that the six employees entered into the transaction and invested their money. There was no written agreement and no minutes of any meetings of stockholders or directors of either corporation as to any agreement. It was agreed that William I. Parke, who was a certified public accountant and treasurer of both corporations, should be responsible for the accounting procedures between Fairway and the petitioner and should fix the prices which should be charged by Fairway to the petitioner in such amounts as he thought would be fair to both corporations. During the existence of Fairway the stockholders of Fairway continued to be employees of petitioner. They did not draw any salary from Fairway, but petitioner charged Fairway some portion of the salaries and office expense incurred by it in managing Fairway. These were charged to Fairway on the books of the petitioner and treated as income by the petitioner in its returns. The total purchases made by petitioner from Fairway amounted to $652,026.43 in the taxable year ended March 31, 1953, and $185,536.39 from April 1, 1953 to June 30, 1953, a total of $837,562.82. The gross sales price which *37 petitioner realized upon this production was about $1,500,000, which was reflected in its tax returns. The petitioner did not pay Fairway cash for merchandise. Rather, the amount charged by Fairway was credited to Fairway's account on petitioner's books. However, the petitioner advanced money to Fairway for working capital. Between April 1953 and June 30, 1953, it advanced Fairway $200,000. In the prior year the petitioner had advanced $445,000. On June 30, 1953, Fairway was indebted to the petitioner in the amount of $243,826.46. It developed that the costs of production incurred by Fairway were greater than had been anticipated. It was found that it was not possible to obtain satisfactory prefabricated metal parts in the area and such parts had to be made by petitioner in Los Angeles and shipped to Fairway at Sandwich, thus increasing the cost by freight payments. It also developed that the cost of labor was not as low as had been expected.a plant had been rented, but it was not suitable for an expansion program without spending a great deal of money. In view of this, Parke, because of his loyalty to the petitioner, did not set up prices for the goods furnished by Fairway to *38 the petitioner in such amounts as would give Fairway a profit, because if he had done so the petitioner could not then have sold them at its customary profit. All the individuals were agreeable to the prices which he set up. The amount of $837,562.82 fixed as the price of the goods furnished to petitioner by Fairway should have been increased 10 to 15 per cent in order to give Fairway a fair profit. In its return for the period February 11, 1952 to March 31, 1952, Fairway showed no profit or loss. In its return for the taxable year ended March 31, 1953, it reported a net income of $11,969.35. In its return for the taxable year ended March 31, 1954 (which covered only the three months of April, May, and June of 1953, since it was dissolved on June 30, 1953), it showed a net operating loss of $14,154.53. Thus the whole operation of Fairway resulted in a net loss and Fairway paid no Federal income taxes. It was about March 1953, that it began to be evident to the various individuals that it would not be possible to fix prices of the articles manufactured by Fairway at an amount which would give Fairway a fair profit and also permit the petitioner to obtain the desired amount of profit *39 on production received from Fairway. Accordingly, it was decided sometime in June 1953, that Fairway should be liquidated. This was upon the recommendation of Parke. In terminating the operations of Fairway, one of the major concerns of Philip Virtue, as president and general manager of the petitioner, was to save harmless the six employees of petitioner who had invested in Fairway. On July 1, 1953, at meetings of the stockholders and directors of Fairway it was resolved to sell the assets of Fairway to the petitioner. The following resolution was adopted: NOW, THEREFORE, BE IT RESOLVED: That Fairway Mfg. Co. sell, transfer, and assign to Virtue Bros. Mfg. Co., as of June 30, 1953, all assets, other than organization expenses of $441.88, of Fairway Mfg. Co., in excess of the amount of stockholders' equity, for the purchase price and consideration of the book value of said assets as shown on the books of the Company as of that date, and for the further consideration of the assumption by Virtue Bros. Mfg. Co. of all indebtedness and liabilities of Fairway Mfg. Co. as of June 30, 1953, except the indebtedness and liabilities of said Company to Virtue Bros. Mfg. Co., which are to be *40 released and waived by Virtue Bros. Mfg. Co. as a further consideration. On the same date a resolution was adopted by the board of directors of the petitioner to purchase the assets of Fairway upon such terms, and Fairway ceased operations on June 30, 1953. The following is a summary of the account with Fairway as contained in the books of the petitioner: ACCOUNTS RECEIVABLE FROM FAIRWAY MFG. CO.
(On Books of Virtue Bros. Mfg. Co.)
Balance April 1, 1952
$ 2,880.43
Charges - Fiscal Year Ended March 31, 1953
Sales of material to Fairway
$234,459.65
Fairway Company purchases paid by Virtue
117,548.32
Cash advanced by Virtue
445,000.00
Charges for management services
26,250.00
Charges for machinery and equipment
10,457.85
Expenses
193.69
833,909.51
$836,789.94
Credits - Fiscal Year Ended March 31, 1953
Finished goods purchased by Virtue
$652,026.43
Accounts payable account (contra)
10,186.72
662,213.15
Balance March 31, 1953
$174,576.79
Charges - April 1, 1953 to June 30, 1953
Cash advanced by Virtue
April
$65,000
May
85,000
June
50,000
$200,000.00
Charges for management service
5,250.00
Sales of material to Fairway
37,939.43
Payments to creditors of Fairway
April and May
$ 8,198.81
June
7,261.37
15,460.18
Office and executive payroll
3,746.25
Sale of machines
1,435.84
Charges for insurance
89.19
263,920.89
$438,497.68
Credits - April 1, 1953 to June 30, 1953
Finished goods purchased by Virtue
$185,536.39
Prepaid freight on Fairway shipments to Virtue ware-
houses
9,134.83
194,671.22
Balance June 30, 1953
$243,826.46
*41 The petitioner closed out its account with Fairway by the following entries on its books: Cash on hand and in banks
$ 10,181.17
Notes receivable
4,034.97
Inventories and supplies
137,971.08
Machinery, equipment, automotive equipment, and
office furniture
68,866.08
Insurance deposits
6,503.87
Prepaid taxes, rentals, and deferred charges
6,286.33
Leasehold improvements - Sandwich, Illinois
24,610.33
$258,453.83
LESS -
Accounts payable
$ 1,043.19
Accrued payroll taxes, and insurance
13,584.18
14,627.37
Net assets taken over
$243,826.46
Net amount due from Fairway
$243,826.46 $
A liquidating dividend of $22,372.94 was paid to the stockholders of Fairway on June 30, 1953. Such stockholders received no other dividends from Fairway. In its income tax return for the taxable year ended March 31, 1954, the petitioner claimed a deduction of $89,912.52 as "Cost of Settlement - Fairway Mfg. Co." As indicated by the books of the petitioner, the claimed loss was arrived at by making the following summarized book adjustments: Write-off of leasehold improvements of Fairway at Sandwich,
Illinois
$24,360.33
Write-down of inventories received from Fairway
24,291.21
Write-down of prepaid taxes, insurance and rentals
4,293.90
Adjustment of audit fees
1,278.15
Machinery and equipment scrapped
1,601.08
Loss on receivable due from Vendor
156.10
Freight on materials and machinery returned to Virtue
22,494.33
Payment of expenses incurred and not recorded by Fairway
Company, including rent, payroll, telephone, utilities, main-
tenance, travel expenses, moving expenses of employees, etc.
14,071.28
$92,546.38
LESS: Sale of equipment and reimbursements
972.91
Insurance and freight claim refunds
1,660.95
$ 2,633.86
$89,912.52
*42 The amount of $24,360.33 in the above tabulation relating to leasehold improvements represents the unamortized balance of costs of the alterations and structural work which had been done by Fairway to a building which it had rented for a 3-year term. The petitioner had no interest in the lease. The lease was canceled by Fairway as of December 1, 1953, by agreement dated September 30, 1953. The improvements had no value to the petitioner. The inventories of Fairway referred to in the above tabulation consisted principally of raw materials, and these were shipped to Los Angeles and commingled with like items in the petitioner's inventory. The petitioner kept its inventory on what is commonly called, in accounting practice, a standard cost basis. The standard cost of this inventory under petitioner's method was $24,291.21 less than the standard cost at which this inventory was taken over at June 30, 1953, from Fairway. Items of inventory acquired by petitioner would remain on hand an average of about three months. The inventory which was received by petitioner from Fairway was used in producing finished products which were sold during petitioner's taxable year ended March 31, 1954. *43 The profit on sales included by the petitioner in its income tax return for that year was based on standard costs of all inventory, including the inventory which petitioner had acquired from Fairway - that is, this particular inventory was not included in the cost of goods sold at the amount of $137,971.08, but rather at that figure written down by an amount of $24,291.21. In its return for the year in question the petitioner made the following representation: SCHEDULE N - BASIS OF INVENTORIES Raw Materials valued at lower of cost or market, first-in, first-out method; Work in Process and Finished Goods valued at standard costs of labor and materials only, plus Standard Landing Costs with respect to Finished Goods in Warehouses. The item of $4,293.90 representing prepaid taxes, insurance, and rentals was of no value to the petitioner. The same is true of the item of $1,278.15, adjustment of audit fees. The item of $1,601.08, machinery and equipment scrapped, represents items taken over by the petitioner, but found to be valueless to petitioner and therefore scrapped. The item of $156.10, loss on receivable due from vendor, represents a charge which Fairway had against one *44 of its suppliers, which the petitioner found it was unable to collect. The item of $22,494.33 represents freight paid by the petitioner to ship all machinery and equipment, materials, and inventory from Fairway's plant at Sandwich to Los Angeles. Of this amount $5,000 represented the cost of transportation of materials and inventory and the remainder represented the cost of transporting machinery and equipment. The item of $14,071.28 represents liabilities which had been incurred by Fairway prior to June 30, 1953, but which had not been recorded on its books and also some liabilities incurred after June 30, 1953, in winding up the affairs of Fairway and putting the rental building back into its original condition as required by the lease. The "rent" included in this item is rental from June 30 to December 1, 1953, due from Fairway to its lessor pursuant to the lease cancellation agreement. The petitioner maintained a reserve for bad debts. In the year in question the petitioner made charges to the reserve totaling $39,437.23 and made an addition to the reserve of $12,389.21, resulting in a credit balance in the account of $30,128.54 as of March 31, 1954. In its return for the *45 year in question the petitioner claimed as a deduction the addition to the reserve of $12,389.21, and the respondent made no adjustment to this item. The petitioner's outstanding accounts receivable were in a lesser amount at the close of the year in question than at the beginning of the year. In the prior taxable year the petitioner had made charges to the reserve totaling $5,567.63. In the notice of deficiency the respondent disallowed the claimed deduction of $89,912.52, stating that this amount is not an allowable deduction under section 23 of the Internal Revenue Code of 1939. As a result of this increase in petitioner's taxable income, the respondent allowed a greater amount as a deduction for contributions under section 23(q) of the Code than claimed by the petitioner. Opinion The petitioner advances a number of arguments in support of its claimed deduction of $89,912.52. However, as we read petitioner's briefs, it appears that the principal contention is that the transaction which occurred as of June 30, 1953, constituted a settlement of its liability under a contract with Fairway. It is argued that there was an agreement between the petitioner and *46 Fairway whereby petitioner would pay Fairway, for goods produced, the cost thereof to Fairway, plus a reasonable profit; that in fact the petitioner did not pay Fairway a reasonable profit; and that petitioner settled its liability to Fairway under the contract by waiving its claim against Fairway for advances made, which had not been repaid, plus the assumption of outstanding obligations of Fairway to others. It is stated that to the extent the amount of indebtedness waived by the petitioner exceeded the value received by petitioner upon the transaction, the petitioner incurred a deductible loss or ordinary and necessary business expense under section 23 of the Internal Revenue Code of 1939. At the outset we note that the stipulation of facts shows that the books of both Fairway and the petitioner show a balance due petitioner from Fairway of $243,826.46 as of June 30, 1953, resulting from cash advances made by petitioner to Fairway, payments on its behalf, sales of materials and machinery to Fairway by petitioner, and charges made by petitioner for management services, which charges had been reported as income by petitioner. On brief both the petitioner and *47 the respondent recognize that there was a debt owing from Fairway to petitioner in that amount on that date. There was no formal agreement between the petitioner and Fairway regarding the payment of cost, plus a reasonable profit, for goods produced by Fairway and furnished to petitioner. There was an understanding among Philip Virtue and the six employees of petitioner, all of whom became stockholders of Fairway, to that effect, and it may well be that in reaching this understanding all these individuals were acting on behalf of the two respective corporations. However, the understanding was oral and the facts show that when Parke, the treasurer of both corporations, fixed the prices to be charged by Fairway to petitioner, which prices did not render a reasonable profit to Fairway, his action was acquesced in by all such individuals. From this we conclude that if there was indeed an oral contract between the two corporations to begin with, it was orally modified and that there was in reality no liability on the part of the petitioner at June 30, 1953, to pay Fairway any greater amounts for goods theretofore received than had already been credited to Fairway on the books of petitioner. *48 Furthermore, we note that there was no suit commenced, nor was there any threat of suit, by Fairway or its stockholders. Indeed, there was testimony by some of the interested parties to the effect that there was no thought of attempting to enforce any claim of this nature. Furthermore, in the resolutions adopted by the stockholders and directors of both corporations with respect to the final settlement, no mention whatever was made of any liability of petitioner to pay Fairway a reasonable profit on its production. Those resolutions refer to the transaction as a sale by Fairway to the petitioner of all its assets, over and above an amount equal to the equity of stockholders, to petitioner at book value, the consideration to be paid by the petitioner to be the release and waiver by petitioner of the indebtedness and liabilities of Fairway to it, plus the assumption by petitioner of all indebtedness and liabilities of Fairway to others as of June 30, 1953. There can be no question that the separate identity of the two corporations must be recognized (see *49 National Carbide Corporation v. Commissioner, 336 U.S. 422, and neither party here argues to the contrary. It is also well established that deductions are a matter of legislative grace and that a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms. New Colonial Ice Co. v. Helvering, 292 U.S. 435. Section 23 of the Internal Revenue Code of 1939 provides, among other things, for the deduction of all the ordinary and necessary expenses paid or incurred in carrying on a trade or business (section 23(a)(1)); losses sustained during the taxable year and not compensated for by insurance or otherwise (section 23(f)); bad debts (section 23(k)); and a reasonable allowance for exhaustion, wear and tear on property used in the trade or business (section 23(1)). Both parties agree that there was, on June 30, 1953, an indebtedness owing to the petitioner in the amount of $243,826.46, and although the transaction in question is referred to in the resolutions of the two corporations as a purchase and sale of the assets of Fairway, we think it clear that the substance of the transaction *50 was a recoupment by petitioner, to the extent possible, of such debt. Accordingly, it is our opinion that the deduction provision of the statute which applies to this transaction is that relating to bad debts. Such being the case, the petitioner is not permitted to resort to the other deduction provisions of the statute. The Supreme Court has clearly held that the provisions relating to bad debts and those relating to losses are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182. [1]
*51 It appears from the petitioner's income tax returns that it had elected the bad debt reserve method of treatment of bad debts, under which system specific bad debts are not deductible. This may account for the fact that the petitioner does not contend for a bad debt deduction. Under the reserve method, the petitioner would be entitled to deduct a reasonable addition to the reserve for bad debts for the year. Section 23(k). The petitioner offered no proof as to the various factors necessary to determine the amount of a reasonable addition to the reserve for bad debts for the year in question. It does appear from the return that charges in large amounts were made to the reserve for bad debts and that a deduction was claimed in the amount of the addition made to the reserve for the year in question. For all that appears in the record the addition which was claimed and allowed as a deduction constituted a reasonable addition to the reserve. Accordingly, we cannot hold that the petitioner is entitled to any further benefit under the bad debt provisions of the statute. Of course, with respect to any assets acquired by the petitioner in the transaction, it must be considered that, to the *52 extent of the fair market value thereof, they were purchased in consideration of the cancellation of indebtedness, and that thereafter, for tax purposes, they would have a basis in that amount. Actually there has been no evidence submitted as to the fair market value of any assets taken over. The only value shown is the "book value" on the books of Fairway. We have set forth in the findings the "assets" which the petitioner purported to have acquired from Fairway in consideration of the waiver of the debt owing to it, and the portions thereof which were written off as worthless. Thus, the petitioner wrote off $24,360.33 on account of leasehold improvements made by Fairway to its rented building; $4,293.90 as write-down of prepaid taxes, insurance, and rentals; and $1,278.15 representing adjustment of audit fees. The Internal Revenue Code contemplates that deductions shall be allowed upon the disposition of assets or upon their becoming worthless in the hands of the taxpayer. Since these items were worthless to the petitioner at the time they purportedly were purchased, we see no basis for allowing a deduction on account thereof. We take a similar view with respect to the item of *53 $1,601.08 claimed for machinery and equipment scrapped. Insofar as the record shows the machinery to that extent was valueless to the petitioner at the time of acquisition. The petitioner also took over receivables from Fairway and it claims a deduction of $156.10 as a loss on such account. If this account became worthless after acquisition by the petitioner, the proper method would be to charge such amount to the reserve for bad debts and thereby would be indirectly reflected in a proper addition to the reserve for the year. For reasons stated above, we cannot conclude that the petitioner is entitled to any benefit of the bad debt provisions of the Code on account of this item. The inventories which were acquired by petitioner from Fairway present a different question. The book value of the inventories was $137,971.08, which represented the amount which such inventories had cost Fairway. We think it proper to consider that of the indebtedness waived by the petitioner, $137,971.08 is attributable to, and represents the cost to petitioner of, such inventories. When taken over by petitioner these inventories were entered on its books at the petitioner's standard cost, which was $24,291.21 *54 less than the $137,971.08, and it was at the lesser figure that these inventories were included in calculating the petitioner's cost of goods sold. Thus the petitioner reported income for the taxable year in question which was $24,291.21 greater than the amount which would have been reported had the petitioner included such inventories at actual cost. We think it clear that in computing the petitioner's income for the year in question, the full amount of the cost, namely, $137,971.08, should be taken into account as part of the cost of goods sold, and this adjustment will be made in the recomputation under Rule 50. Included in the claimed deduction of $89,912.52 was another item, namely, $22,494.33, representing freight paid by petitioner for shipping materials and machinery from Fairway's plant in Sandwich, Illinois, to the petitioner's plant in Los Angeles. According to the testimony of Parke, some portion of this freight related to inventories and some to the machinery and equipment. The petitioner contends that the full amount of the freight payment should be allowed as an ordinary and necessary business expense. While under some circumstances the cost of moving machinery and *55 equipment is properly deductible as an expense, we think that where, as here, the acquisition of the machinery and equipment is to be treated as a purchase, the freight attributable to transporting it would properly constitute an added cost, recoverable through depreciation deductions. See MacAdam & Foster, Inc., 8 B.T.A. 967. We are also of the opinion that any portion of the freight attributable to the transportation of the inventories would properly constitute an additional cost of goods sold. See article 39.22(c)-3(b) of Regulations 118. There has been no proof of the amount of the freight which was charged for transporting the inventories and the amount charged for transporting machinery and equipment. Believing as we do, however, that the petitioner is entitled to an additional cost of goods sold on account of this freight charge, and to a deduction for depreciation on the machinery and equipment based upon this additional cost, we feel it incumbent upon us to make some allocation of the freight charge. Exercising our best judgment, and bearing heavily against the petitioner who has the burden of proof, we have concluded and have found as a fact that of the freight *56 charge $5,000 is attributable to the transportation of inventories. See Cohan v. Commissioner, 39 F. 2d 540. The petitioner is entitled to increase the cost of goods sold in the year in question by that amount. The remainder of the freight charge constitutes an additional cost of the machinery and equipment to be taken into account in the determination of the proper deduction for depreciation on the machinery. Another item included in the claimed loss of $89,912.52 is the amount of $14,071.28, representing unrecorded obligations of Fairway which petitioner assumed and paid, including rent, payroll, telephone, utilities, maintenance, travel expenses, moving expenses of employees, etc. These individual items were, according to the stipulation of facts, expenses incurred by Fairway in the conduct of its business. They were not ordinary and necessary expenses paid or incurred by the petitioner in its business. Indeed, it clearly appears that the petitioner need not have paid this amount had it, as creditor, insisted that all the assets of Fairway be applied to its indebtedness, rather than distributed, to the extent of $22,372.94, as a liquidating dividend to Fairway's stockholders. *57 Petitioner advances as a reason for permitting the withdrawal of the liquidating dividend that it was to its business advantage to save the stocholders of Fairway from loss, inasmuch as they were valued employees of petitioner. We cannot subscribe to this tenuous reasoning. The petitioner did not, in fact, pay any amounts to its employees as such, and we are not called upon to here determine whether any such payments would be deductible had they been so made. The amount of the deduction to which the petitioner is entitled on account of contributions, pursuant to section 23(q) of the Code, will be recomputed in the light of the foregoing holdings. Decision will be entered under Rule 50. Footnotes
1. The Supreme Court stated in that case: Petitioner also claims the right of deduction under section 234(a)(4) of the Revenue Act of 1918 providing for the deduction of "losses sustained during the taxable year and not compensated for by insurance or otherwise." We agree with the decision below that this subdivision and the following subdivision (5) relating to debts are mutually exclusive. We so assumed, without deciding the point, in Lewellyn v. Electric Reduction Co., 275 U.S. 243, 246, 48 S. Ct. 63, 72 L. Ed. 262↩. The making of the specific provision as to debts indicates that these were to be considered as a special class and that losses on debts were not to be regarded as falling under the preceding general provision. What was excluded from deduction under subdivision (5) cannot be regarded as allowed under subdivision (4). If subdivision (4) could be considered as ambiguous in this respect, the administrative construction which has been followed from the enactment of the statute - that subdivision (4) did not refer to debts - would be entitled to great weight. We see no reason for disturbing that construction.