**UNITED STATES of America,**

v.

**Sol BERGER, Defendant.**

**No. 69 Cr. 496.**

United States District Court,
S. D. New York.

May 5, 1971.

---

Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, New York City, for United States, Ross Sandler, Asst. U. S. Atty., of counsel.

Kostelanetz & Ritholz, New York City, for defendant, Boris Kostelanetz, Jules Ritholz, New York City, of counsel.

EDWARD WEINFELD, District Judge (orally):

While many witnesses have testified and many exhibits have been received in evidence, with a tendency at times on the part of counsel to proliferate matters by the introduction of doubtful relevant testimony and exhibits, the issues presented are comparatively simple.

Thus, it is desirable to start with the indictment, to consider the essential elements of the crime charged, and to determine whether the government has sustained its burden of establishing these essential elements beyond a reasonable doubt.

Count 1 of the indictment charges:

"The Grand Jury charges:

"On or about the 17th day of June 1963, in the Southern District of New York, SOL BERGER, the defendant, who was then and there the President and Chief Executive Officer of Colonial Corporation of America, a corporation, unlawfully, wilfully and knowingly did attempt to evade and defeat a large part of the income tax due and owing by the said corporation to the United States of America for the calendar year of 1962, by preparing and causing to be prepared and filing and causing to be filed with the District Director of Internal Revenue for the Manhattan District, New York, New York, a false and fraudulent income tax return, wherein it was stated that the taxable income of the said corporation for the said calendar year was the sum of $1,360,287.06 and that the amount of income tax due and owing thereon was the sum of $690,024.48, whereas, as the defendant then and there well knew, the taxable income of the said corporation for the said calendar year was the sum of approximately $1,654,430.72, upon which said taxable income there was due and owing to the United States of America an income tax of approximately $842,979.19. (Title 26, United States Code, Section 7201; Title 18, United States Code, Section 2)."

A similar charge is made for the years 1963 and 1964, but the amounts of alleged evasion of tax are different in each year.

With respect to each count, the burden of proof is upon the government to establish beyond a reasonable doubt:

(1) that a substantial tax was due and owing from Colonial Corporation of America in addition to that reported in its return;

(2) that Sol Berger, the defendant, made an attempt to evade or defeat the additional tax due; and

(3) that he did so willfully.

At the outset, issue is joined on the first element, that additional taxes were due—a matter of sharp dispute. The defendant, in the years in question and in preceding years, was the chief executive officer of Colonial Corporation of America (hereafter Colonial, or the parent corporation). Originally, he and his wife owned 100% of its capital stock. The corporation achieved a substantial success and growth in the manufacture, sale and distribution of low-priced shirts, blouses and related items. Subsequently, in the latter part of 1959, the stock was sold publicly, and in the period in question the defendant and his wife owned at least 38% of Colonial's outstanding stock. The corporation had various wholly-owned subsidiaries which manufactured products and sold most of their output to the parent corporation.

In 1959, the defendant caused the organization of another wholly-owned subsidiary, Colonial Shirts of Jamaica, Ltd. (hereafter Jamaica, or the subsidiary), under the laws of Jamaica, British West Indies, a so-called offshore corporation, which had the benefit of tax exemption for a period of seven years. In addition, another advantage was an available labor supply at lower wages than that obtainable in the domestic market, where other subsidiaries of Colonial also manufactured shirts, as well as other products.

Colonial bought for resale to its retailers the entire production of the finished products manufactured by Jamaica. The price at which the manufactured product was shipped to and exported from Jamaica, British West Indies, to Colonial in the United States was the constructed value, referred to hereafter. In the manufacture of the shirts so acquired by the parent corporation the subsidiary used piece goods, which had been imported from Japan, which the vendors

there invoiced to Jamaica, the subsidiary. A portion of the cost of these piece goods, as well as trim and supplies—$294,251 in 1962, $237,023 in 1963, and $383,412 in 1964—although invoiced by the vendors to Jamaica and used by it in the manufacture of the finished product, was entered on the books of Colonial as its purchases. The net effect, no matter how stated, is that the entries in Colonial's purchase journal—treating the cost of piece goods and the other items as Colonial's cost, and deductible as such—reduced the gross income of Colonial of America as shown on its tax returns, and correspondingly reduced its tax in each year. Stating it somewhat differently, had Jamaica, the subsidiary, been debited with the entire cost of the piece goods, as well as items of supply and trim, used by it to manufacture the finished product which it exported to its parent, the taxable income of the parent would have been increased, as shown by the exhibits submitted by the government in the amounts stated in the indictment. Whether or not those amounts of additional taxable income are precise, they are substantial and the tax due and owing substantially more than that reported. And this is so, even eliminating the trim and supplies, since the piece goods formed the greatest part of the items so entered. The piece goods debits alone amount to $261,370 for the year 1962; $192,121 for the year 1963; and $307,668 for the year 1964.

The government's position is that entering these items on the purchase journals of Colonial and treating them as a part of its cost of goods sold was fraudulent in that the cost was a part of Jamaica's cost of manufacture, and that the defendant caused such items to be debited to Colonial's purchase journals in an attempt to evade or defeat a portion of Colonial's taxes.

The defendant's position is that Colonial was entitled to offset from its gross receipts the cost of raw materials, including the piece goods, trim and supplies, which it paid for; that "expensing," as the term has been used, of the piece

goods by Colonial was an indirect cost to it of goods sold. The defendant's further claim is that the entries reflected, in accordance with Colonial's policy, an adjustment to allocate a fair portion of the profits to Jamaica and, to use the language of his counsel, "[h]ad the allocation not been made, the subsidiary would have had to operate at a loss or at a relatively trifling profit well below the profits" of the parent corporation. However, the record does not bear out the contention that the subsidiary was operating at a trifling profit or a loss.

The finished shirts and blouses exported by Jamaica to its parent were subject to an import duty. Since the transactions were not at arms length, a constructed value was determined under 19 U.S.C., section 1401a. In substance, "constructed value" is the sum of the cost of materials, fabrication, processing, overhead, general expenses and profit equal to that usually reflected in sales of merchandise of the same kind by producers in the country of exportation. The "constructed price" was arrived at as a result of conferences between Leonard Friedman, in charge of production of all the companies owned by the parent, and customs officials. The imported goods were invoiced, as they had to be under the statute, at the constructed price, on which a duty of 20 or 25%, according to the item of merchandise, was payable.

There appears to be no dispute that the constructed value, the invoice price to Colonial, was at a low price, which some witnesses described as not reflecting a realistic price, or a fair price for the exported product. And the defense position that no tax is due derives in large measure from this situation. The claim is that since the price at which Jamaica billed the goods to Colonial was too low, in order to yield a fair profit to Jamaica or one proportionate to the profit realized by Colonial in the resale of the product, Colonial absorbed part of the expense for the piece goods and other items used in the manufacture of the finished product, and that the adjustments were made for this purpose and

consistent with Colonial's alleged basic policy to allow a fair profit to its subsidiaries. But this does not resolve the question as to whether or not the so-called adjustments or entries in the purchase journals of Colonial, under the circumstances here presented, reflected items of necessary expense of Colonial's business or its cost of goods sold.

The defendant's position also is that had all piece goods and other raw materials been charged to Jamaica as part of its cost of production, the same gross profit would have been divided between Colonial and Jamaica, but on a different profit ratio.

The various conceptual and alternative theories of what might have been done must yield to the facts. The Court must take the transactions as they occurred and in the manner they were treated at the time of the occurrence. It is the fact situation at the time of the alleged offense that controls. United States v. Vardine, 305 F.2d 60, 64 (2d Cir. 1962); Scanlon v. United States, 223 F.2d 382, 389 (1st Cir. 1955); Clark v. United States, 211 F.2d 100, 105 (8th Cir. 1954), cert. denied, 348 U.S. 911, 75 S.Ct. 289, 99 L.Ed. 714 (1955); cf. National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 435, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The simple fact is that had all the piece goods and raw materials invoiced to Jamaica by foreign vendors and others, and used in the manufacture of the finished shirts and blouses, been entered on the books of Jamaica as its cost of production, an increase in the constructed price charged to Colonial would have been required, with the income picture of both corporations affected accordingly; or as defense counsel put it: "[t]he only alternative to the adjustments would have been to charge the Jamaican subsidiaries for the full amount of purchases and supplies and in turn to have increased the amount of the billings to the parent from the Jamaican subsidiaries by an equivalent amount." The policy of Colonial was to keep the constructed price down, since the higher the price the higher the duty that Colo-

nial had to pay. In end result, this reduced customs duties on the merchandise and the adjustments also reduced Colonial's taxable income.

■ The corporations were separate entities; however, this did not give Colonial the right to make intercompany adjustments as it willed—but only within law. Cf. National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 434–436, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The basic rule is that for tax purposes, parent and wholly-owned subsidiaries are treated as separate entities no matter how closely affiliated. Ordinarily, the separate corporate entities of parent and subsidiary preclude the parent from deducting expenses incurred by its subsidiary. The concept is that the payment by the parent to cover such expenses is related to the business of the subsidiary and not its own business, and as such is not deductible. Fall River Gas Appliance Co. v. Commissioner of Internal Revenue, 42 T.C. 850, 858 (1964), aff'd, 349 F.2d 515 (1st Cir. 1965); see also National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); Young & Rubicam, Inc. v. United States, 410 F. 2d 1233, 187 Ct.Cl. 635 (1969); Columbian Rope Co., 42 T.C. 800 (1964). It is true that items expended for a subsidiary *may* be deductible by a parent corporation as an ordinary or necessary expense of the parent, such as was allowed in Fishing Tackle Prods. Co., 27 T.C. 638 (1957), and Fall River Gas Appliance Co. v. Commissioner of Internal Revenue, 42 T.C. 850 (1964), but only under unique and compelling circumstances. It is significant that in the *Fishing Tackle* case the parent needed the product of the subsidiary, which was its sole source of supply and without which the the parent would have been unable to meet the demands of its customers and its position in the industry threatened. The payments made by the parent covered operating losses of the

subsidiary and were held deductible as a necessary business expense made to maintain and preserve its source of supply. The threatened elimination of the parent's sole source of supply, without which it would have ceased operation, was the compelling circumstance underlying the court's holding.

However, the facts of this case do not parallel those of *Fishing Tackle*. The cost of the piece goods and other items used by Jamaica was part of its day to day manufacturing activity in furtherance of its business. Without the raw materials there could be no finished product. The piece goods used by Jamaica in the manufacture of the shirts were, to use the words of Colonial's production chief, "a vital component of our cost." That Colonial supplied the funds for the purchase of the goods is not material, especially when Colonial had numerous other sources of supply. Such payments would not be deductible as an expense to Colonial, but would be considered a contribution or a loan to capital of Jamaica. Cf. Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 594, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943). The cost of piece goods, as accurately as could be determined, was used in determining constructed value. That cost was Jamaica's ordinary and necessary expense required in order to manufacture the finished product, and no amount of dialectical discussion of what might have occurred if the transaction had been treated differently can down that fact. That the payments by Colonial are now referred to as both a direct and indirect payment for the cost of goods acquired does not alter the fact. Moreover, despite the reference to what might have been the end result of a "C, M, T", a cut, make and trim operation, this was not the situation that existed. The defendant participated in the decision that Jamaica was to function otherwise and was to manufacture the completed garment and that piece goods from the Far East were to be purchased by and billed directly to Jamaica.

The fact that the quarterly adjustments of piece goods invoices were taken at random and reflected only a portion of the invoices to Jamaica militates against the contention that the adjustments were made as a cost of goods sold to Colonial. The alternative argument that the items were absorbed by Colonial to "assure a fair profit" to Jamaica is faced with the fact that had the piece goods and other materials been expensed to Jamaica, Jamaica still would have reflected a profit, unlike the subsidiary in the *Fishing Tackle* case.

■ The defendant's contention that the piece goods and other items were properly charged to Colonial and deducted under section 482 of Title 26 is without substance. This is a section to be invoked by the Commissioner of Internal Revenue to allocate gross income or deductions between or among related businesses when the Commissioner deems it necessary to prevent the evasion of taxes or clearly to reflect the income of such businesses. Its purpose is to prevent the arbitrary shifting of income and deductions among controlled and controlling corporations. 26 C.F.R. § 1.482–1(b). It is not a delegation of authority to a parent to treat at will the necessary expenses of its subsidiary as its own, for the parent's benefit and to the detriment of government in its right to taxes justly due.

■ The Court finds with respect to the first essential element that the debit entries on the purchase journals of Colonial for the piece goods and other raw materials purchased by and invoiced to Jamaica, delivered by the vendors to Jamaica, which raw materials were used by Jamaica in the manufacture of the finished product, were improperly deducted by Colonial as its expense or its cost of goods sold; that the government has sustained its burden of proving that Colonial overstated its cost of goods sold in its tax returns for the years 1962, 1963 and 1964 by deducting expenses for goods acquired by Jamaica, which should not have been charged on the purchase

journals of Colonial. The Court further finds the government has established that a substantial amount of income tax was due and owing from Colonial for each tax year in question in addition to that set forth in the return for each year. A substantial additional tax was due even if only the piece goods items are taken into account, and trim and supplies excluded.

It necessarily follows, upon the entire evidence, that the returns in question were false in the material respect of the improper deductions by Colonial, and also that the defendant knew this. While the defendant urges he personally did not sign the Colonial returns, that they were prepared and executed by Epstein, the vice president in charge of financial matters for Colonial, the evidence is abundant that the entries on Colonial's books of the cost of the invoiced items to Jamaica for the piece goods and other items were made at his direction and at all times with his knowledge—that they were made with his knowledge and consent is not in dispute. And he also knew the entries on Colonial's books would be reflected in Colonial's tax returns with consequent reduction of taxable income and taxes due. The fact that he himself did not sign the return is of no consequence. The government has sustained its burden as to the second element.

Thus, there remains for consideration the final element—did the defendant willfully attempt to evade or defeat the additional tax due and owing. The presumption of innocence with which the law endows the defendant extends to every element of the crime charged, and here the question is whether the government has carried its burden of establishing that the defendant acted willfully and with a specific intent to defraud the government of the taxes due.

The term "willful" connotes deliberate, voluntary and purposeful action, with a specific wrongful intent to violate the law, as distinguished from inadvertent or accidental, or an honest misunderstanding of what the law requires or permits. Various terms have been used to define willfulness or guilty knowledge, such as fraudulent intent, an evil motive, a bad motive, or a vicious will. *Cf.* Morissette v. United States, 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *see also* United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (Apr. 5, 1971); United States v. Platt, 435 F.2d 789, 794 (2d Cir. 1970). It has also been defined as a state of mind of a person wherein he is fully aware of the existence of a tax obligation which he seeks to conceal or evade. United States v. Martell, 199 F.2d 670, 672 (3d Cir. 1952), cert. denied, 345 U.S. 917, 73 S.Ct. 728, 97 L.Ed. 1350 (1953); *see also* United States v. Vitiello, 363 F.2d 240, 242 (3d Cir. 1966). However, willfulness may not be inferred solely from proof of understated taxes. A specific intent to evade or defeat the tax must be proved by independent evidence of willful affirmative acts. Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1942), the leading case on the element of willfulness, points out some such acts which may be considered. These include making false entries and any conduct the likely effect of which would be to mislead or to conceal, and if the tax evasion motive plays any part in such conduct, the offense may be made out, even though the conduct may also serve other purposes.

To the extent that the entries of the invoices on Colonial's books were improper deductions, as the Court has already found, they may be said to be false; but this does not, in and of itself, necessarily establish that they were made or conceived of with a fraudulent and criminal intent to evade taxes. More must be shown by affirmative conduct to effect that purpose.

The government contends that the defendant's acts and conduct establish that the entries on Colonial's books which purported to be its expenses when in fact they were Jamaica's were not only false entries, but were made at the defendant's specific direction with the

fraudulent intent to defeat a portion of Colonial's taxes, and that his clandestine acts and conduct with respect to the transactions evidence a purpose to conceal and mislead, which the government contends in fact they did.

The determination of the issue of willfulness turns in large measure upon the evaluation of the credibility of government witnesses and the defendant. Their respective versions of the origin of the entries, knowledge of records with respect thereto, and other significant factors relating thereto are in sharp conflict.

Mrs. Milligan, the principal bookkeeper of the Colonial corporation, under whose immediate direction all entries were made in the books of original entry, testified that late in 1959 or early 1960, the defendant directed her to enter on Colonial's books a portion of the invoices for piece goods shipped and invoiced to the Jamaica corporation, in the approximate amounts of $50,000 to $75,000 in each quarter; that such entries were made in Colonial's purchase journals; that the defendant asked her to keep a separate record of such transactions, which she did; that he was the sole person to whom she delivered, either in person or by mail, the reports of the quarter-annual entries.

Friedman, the production chief of all the companies, and Epstein, originally the certified public accountant for Colonial, and at the period here in question its chief financial officer, who, together with the defendant, constituted the top management team of Colonial, each categorically denied he ever knew of the entries, or that piece goods invoiced to Jamaica were treated on Colonial's books as its expense or purchase until early 1965, when they first learned of the practice, although each was aware of a general practice with respect to trim and supplies delivered to Colonial's subsidiaries or contractors. Epstein and Friedman each denied they ever saw or received records or reports of the entries which Mrs. Milligan testified she submitted regularly to the defendant at the end of each quarter.

The government also points to the testimony that the regular accountants of Colonial and those working under them were unaware that piece goods, trim and supplies invoiced to Jamaica were not entered on its books, but instead on the purchase journal of Colonial as its own purchases, and this was also true of the company's outside auditors. Finally, while the bookkeeper knew the entries were made, she was not told the purpose thereof; she just did what she was told to do.

This and other evidence, the government contends, demonstrates that the defendant's acts were intentional and fraudulent; also that he concealed from the top executives and accountants the false nature of the entries. In sum—it contends it has established that what the defendant did amounted to padding the books of Colonial with expenses not its own—expenses that he knew were those of Jamaica.

The defendant, as already noted, contends that the entries were made as an adjustment to reflect a fair price and fair profit to Jamaica, consistent with Colonial's policy as to all its subsidiaries—in sum, that they were made in good faith without fraudulent purpose and that the transactions were open and known to others. He denied, or did not recall, that in 1959 or thereabouts he instructed Mrs. Milligan to make deductions, as she testified; he denied he directed her to keep a record thereof or to report to him; he had no recollection of seeing specific reports of piece goods invoice adjustments, although he said such reports were submitted at the quarterly meetings when Friedman and Epstein were present. He testified, contrary to Epstein and Friedman, that usually at the quarter-annual meetings allocations between parent and subsidiaries, including Jamaica, were discussed and adjustments determined. In sum, he testified that both Friedman and Epstein discussed and participated in the quar-

terly adjustments of the piece goods invoices, but was not sure how the information was transmitted to Mrs. Milligan to make the appropriate entries. On a number of matters of substance, defendant's testimony was vague and at times irresponsive.

The spiral notebooks in which Mrs. Milligan and others under her direction recorded the Jamaica piece goods invoices and other items, reports of which she testified were either delivered or mailed to the defendant, are in evidence. Those reports speak for themselves. Thus, one dated 12/31/62 reads:

"Mr. Berger

Below are entries made on Colonial's books, which purchases and expense actually belong to Jamaica.

For-4th quarter"

Another, dated 3/31/63, reads:

"Mr. Berger,

below are entries made on Colonial's books which actually belong to Jamaica."

Other reports use substantially the same language.

Also in evidence is an exhibit bearing defendant's typed name and the initials SB:HF, Exhibit 72B, dated May 22, 1961, addressed to Mrs. Milligan, which reads in part:

"At the end of each month please send to me a list of transactions paid by Colonial which should have applied to Colonial Shirts of Jamaica."

An issue was raised as to whether or not it was the defendant himself who dictated and caused this letter to be sent. His testimony was that he had no recollection as to whether he dictated it. However, upon all the evidence, I am satisfied that the letter was dictated by the defendant and was mailed to Mrs. Milligan pursuant to his directions.

Based upon the Court's trial notes, which include its contemporaneous appraisal of each witness, a word by word reading and study of the stenographic transcript of the trial, the demeanor of the witnesses, an evaluation of their credibility and the reasonable inferences to be drawn from established facts and surrounding circumstances, the Court accepts the substance of the testimony of the government witnesses as credible, and their version of the matters referred to as substantially true.

Upon the entire record the Court finds that the government has also established beyond a reasonable doubt the requisite element of willfulness.

Accordingly, the Court finds that the government has established beyond a reasonable doubt all the essential elements of the crime charged and finds the defendant guilty under each count.

The foregoing shall constitute the Court's Findings under Rule 23 of the Federal Rules of Criminal Procedure.