UNITED STATES of America, Appellee,

v.

Sol BERGER, Appellant.

No. 326 Docket 71–1856.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1971.

Decided March 20, 1972.

George G. Gallantz, New York City (Proskauer, Rose, Goetz & Mendelsohn, New York, N. Y., David I. Goldblatt, Aron B. Katz and Herbert T. Weinstein, New York City, of counsel), for appellant.

Ross Sandler, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Michael I. Saltzman and Peter F. Rient, Asst. U. S. Attys., of counsel), for appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Sol Berger appeals from a judgment of conviction on each of three counts of an indictment for the willful evasion of income tax due from the Colonial Corporation of America ("Colonial"), of which he was president and chief executive officer, by causing to be prepared and filed false corporate tax returns in each of the calendar years 1962, 1963 and 1964 (26 U.S.C. § 7201 and 18 U.S. C. § 2). After trial without a jury in the United States District Court for the Southern District of New York, 325 F. Supp. 1297 (1971), the Honorable Edward Weinfeld found appellant guilty and sentenced him to serve concurrent eighteen month prison terms on each count, fifteen months of which were suspended, to one year probation upon release from jail, and to pay a total of $30,000 in fines. Appellant insists that no substantial unreported tax was due from Colonial in the relevant years, and that, in any event, there was an insufficient showing he had acted with criminal intent. We disagree with both contentions and affirm the conviction.

Colonial, once wholly owned by appellant and his wife, became a large and successful manufacturer and wholesaler of low priced wearing apparel, making its first public offering of shares in 1959. Appellant, however, retained control of the firm and remained chief executive officer during the relevant period, his ownership never falling below 38% of the outstanding stock. Appellant sold his entire interest in 1966 when Colonial was merged into Kayser-Roth Corporation.

In 1959, already parent to several wholly-owned subsidiaries whose output it largely consumed, Colonial conceived yet another, Colonial Shirts of Jamaica, Ltd. ("Jamaica"), a foreign corporation benefiting from its permanent exemption from United States taxes and seven year exemption from Jamaican taxes, as well as from access to cheap labor. Jamaica procured piece goods (fabric) and trim (threads, buttons, labels) from vendors in Japan and elsewhere, who invoiced their sales to Jamaica, which then sold its entire production of finished shirts to Colonial. Appellant maintains that the price paid Jamaica for its output was unrealistically low in order to lessen custom duties on import, albeit customs officials necessarily approved the constructed price (19 U.S.C. § 1401a) for the shirts in this non-arms length transaction. Purportedly to allow its subsidiary a fair profit, Colonial adopted the practice of supplementing the invoice price by making payments directly to the vendors supplying Jamaica with piece goods and trim. The payments were made not at a fixed amount for each shirt purchased, but by randomly selecting Jamaica invoices for payment to total an arbitrary sum of $50,000 to $75,000 each quarter. Colonial then entered these payments to Jamaica's creditors on Colonial's own purchase journal, resulting in their deduction from its gross income, and a corresponding reduction in taxes paid. Colonial was thereby able to create for Jamaica "fair" profit margins of 28%, 28% and 29% in the relevant years, rather than the profit margins of 6%, 13% and 9% which Jamaica would have enjoyed at the constructed price had it paid all its own bills; on these profits, no taxes at all were paid.

Appellant contends that the supplemental payments were fairly an indirect cost to Colonial for its goods sold, which, when added to the prices invoiced by Jamaica, resulted in a fair arms length price for the garments purchased.[1] Since the alternative, the argument concludes, would simply be to add the cost of the supplemental payments to Jamaica's invoiced prices, the same income tax would be paid by Colonial either way. Assuming *arguendo*, that such a conclusion is logically correct,[2] appellant's hypothetical restructuring of the taxable transaction is irrelevant to our examination of his actual conduct. United States v. Campbell, 351 F.2d 336, 340 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 884, 15 L. Ed.2d 662 (1966); United States v. Vardine, 305 F.2d 60, 64 (2d Cir. 1962). We are concerned not with whether appellant might have sought a higher constructed price for Jamaica's apparel, thereby achieving similar deductions for Colonial while simultaneously paying higher customs duties and reducing the untaxed profit to Jamaica, but with the propriety of the procedure in fact used: the clandestine payment of Jamaica's bills in order to manipulate Colonial's profits while paying lower customs duties and maintaining Jamaica's untaxed profits at levels approaching 30%.

In maintaining that Colonial was indeed entitled to take the disputed deductions, appellant concedes the fundamental principles that a parent corporation and its subsidiary are separate taxable entities, however close their relationship, National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), and that, ordinarily, a parent cannot deduct expenses incurred by its subsidiary. Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943). *See* 26 U.S.C. § 162(a). Rather appellant seeks to place himself within the ambit of those exceptional cases such as Fishing Tackle Products Co., 27 T.C. 638 (1957) and Texas and Pacific Ry., 1 C.C.H. Tax Ct.Mem. 863 (1943), which under unusual circumstances allow a parent corporation to deduct as ordinary and necessary expenses items expended for a subsidiary. In *Fishing Tackle* the deducted payment, appearing openly on the parent's books, was a temporary measure to compensate its subsidiary for an actual loss in its operations. Moreover, the subsidiary in that case was the sole source of supply of a product for which the original, arbitrarily established price had proved inadequate, and was therefore indispensable to the parent's continued operation. Similarly in *Texas and Pacific Ry.*, the deducted payment exactly equalled the operational loss of a subsidiary which had been organized solely to provide a service to the parent, and not to make a profit. Far different is the instant case involving an ongoing and hidden system by a parent corporation to make payments to the creditors of its subsidiary, one not necessary to the continued existence of its parent, in order to increase the already significant tax free profits which that subsidiary could have expected on the basis of the carefully documented constructed price for its output. The piece goods and trim billed to Jamaica, but paid for and deducted by Colonial, were no more than the routine manufacturing expenses of Jamaica.[3]

1. Appellant does not dispute that if his theory was incorrect, the amount of tax due and owing from Colonial was substantial.

2. The established constructed price was, after all, carefully substantiated by Colonial, approved by a United States Customs examiner, and based on the premise that Jamaica would pay its own costs for piece goods and trim; it allowed Jamaica an average profit margin of roughly 8%. Although naturally kept as low as possible to minimize import duties, the constructed price does not appear to have been unrealistic.

3. Having found the fraudulent deduction by Colonial of expenses properly attributable to Jamaica, we are, as we have said, not concerned with alternate procedures appellant might legitimately have employ-

As the district court observed: "[s]uch payments would not be deductible as an expense to Colonial, but would be considered a contribution or a loan to capital of Jamaica." 325 F.Supp. at 1302.

█ Addressing itself to the issue of criminal intent, the district court stated that:

> [b]ased upon the Court's trial notes, which include its contemporaneous appraisal of each witness, a word by word reading and study of the stenographic transcript of the trial, the demeanor of the witnesses, an evaluation of their credibility and the reasonable inferences to be drawn from established facts and surrounding circumstances, the Court accepts the substance of the testimony of the government witnesses as credible, and their version of the matters referred to as substantially true.

[325 F.Supp. at 1305]

The government's independent evidence of willful affirmative acts beyond its proof of understated taxes, Spies v. United States, 317 U.S. 492, 499, 63 S. Ct. 364, 87 L.Ed. 418 (1943) included the following: (1) appellant directed Colonial's bookkeeper to remove Jamaica invoices in the amount of $50,000 to $75,000 each quarter for treatment as expenses on the books of Colonial; (2) he and only he received from the bookkeeper separate records which were kept of each false entry; (3) he concealed this procedure from all other top officers of Colonial, from Colonial's accountants and from its outside auditors. Appellant's denials not having been credited by the trial court, its finding of criminal intent beyond a reasonable doubt is amply supported by the evidence.

Affirmed.

ed to reach the tax result he sought. We agree with the district court that 26 U.S.

C. § 482 does not pertain to the case at bar. *See* 26 C.F.R. § 1.482–1(b).